## IN THE MATTER OF THE ESTATE OF BERNICE PAUAHI BISHOP, DECEASED.

### No. 2595.

ARGUED MAY 28, 1945.                    DECIDED JULY 24, 1945.

KEMP, C. J., PETERS AND LE BARON, JJ.

112

OPINION OF PETERS, J.

These are petitions by trustees of a perpetual charitable testamentary trust for the allowance of their annual accounts. The accounts, the allowance of which was prayed, were the 57th and 58th annual accounts for the fiscal years ending June 30, 1942 and June 30, 1943, respectively. The only items of the accounts that came in controversy were the trustees' commissions, *viz.*, (a) those computed upon rents received for the use and occupation of the present Kamehameha Schools, upon the cost of construction of which the trustees had previously received commissions as a "final payment" within the meaning of that term as employed in the existing law at the time of payment fixing the compensation of fiduciaries, and (b) those charged by the trustees upon income received by them during the fis-

cal year ending June 30, 1943, within which period the compensation to which trustees of charitable trusts were entitled was reduced by amendment in respect to all income received in excess of $105,000 from 5% to 3% on the next $100,000 in excess of $105,000, 2% on the next $300,000 and 1% on all over $505,000. The income of the trust estate during the accounting period covered by the 58th annual account exceeded $505,000.

The present Kamehameha Schools were erected by the trustees pursuant to the directive contained in the will and codicils of their testatrix, as construed in the case of *Smith* v. *Lymer* (post), for which purpose and their perpetual maintenance she bequeathed her entire residuary estate. The federal government leased the present school buildings and grounds for hospital purposes made necessary by the war emergency and it was upon that portion of the rents received therefor, allocable to the school buildings, that the commissions were computed.

The law of Hawaii in existence prior to January 1, 1928 made no provision for compensation of trustees. Compensation of executors, administrators and guardians, for their services as such, was allowed by statute. (R. L. H. 1925, § 2544.) It was not until 1928 that the compensation of trustees for their services as such was fixed by statute. (L. 1927, c. 183, effective Jan. 1, 1928.) Compensation of executors, etc. included commissions upon capital and income. The provisions of the statute pertinent to capital is quoted in the margin.[1] A similar provision in amended form since the amendment of 1927 applies to trustees.

---

[1] "Fees and expenses of executors, administrators and guardians: Executors, administrators and guardians shall be allowed the following commissions upon all moneys received and accounted for by them, that is to say:

"Upon all moneys received representing the estate at the time of the

The law of Hawaii allowing compensation to trustees as it existed at the accounting period of the 58th annual account is to be found in the Revised Laws of Hawaii 1935, section 3793, as amended by Laws of 1935, Act 124 and as further amended by Laws of 1943, Acts 88 and 149. With the amendment of 1935 we are not concerned. Act 88 of the Laws of 1943, effective April 30, 1943, amends the first paragraph contained in section 3793 referring to compensation of trustees. The paragraph as it existed prior to the amendment and the amendment are paralleled in the footnote.[2] The supplied italics emphasizes the pertinent provisions involved.

It should be noted that the words "upon all moneys * * * executors, administrators, trustees and guardians shall be allowed as commissions payable out of the income" are repeated in the amendment of April 30 but qualified by the adverbial phrase "received during each year;" that the words contained in the original amendment "such commissions to be allowed upon each accounting when made"

institution of the trust, such as cash in hand and moneys realized from securities, investments, and from sales of real estate and personal property other than interest, rents, dividends and other profits coming due after the inception of the trust, two and one-half per centum.

"Upon the final payment thereof or any part thereof, two and one-half per centum; provided, however, that no commission shall be allowed as for final payments of such moneys except upon amounts actually expended and upon balances paid into court or to the parties thereunto entitled, upon the final settlement of the services for which such executors, administrators or guardians shall have been appointed and qualified."

[2] "Fees and expenses of executors, administrators, trustees and guardians: Upon all moneys received in the nature of revenue or income of the estate such as rents, interest and general profits, executors, administrators, trustees and guardians shall be *allowed* as commissions payable out of the in-

"Fees and expenses of executors, administrators, trustees and guardians: Upon all moneys and other property received in the nature of revenue or income of the estate, such as rents, interest, dividends and general profits, executors, administrators, trustees and guardians shall be *allowed* as commis-

are deleted and the prepositional phrase "to be payable as and when such income is received" is added, qualifying the word "commissions." Chapter 149 of the Laws of 1943, effective May 11, 1943, quoted in the margin,[3] is an addition to the provisions of section 3793, relating to the compensation of trustees, as previously amended. It is in the nature of a proviso, excepting from the operation of the section compensation to which trustees of charitable trusts may be entitled, limiting trustees' commissions to a schedule different from and lower than the schedule of commissions applicable to trustees of private trusts and making the provisions of the amendment applicable "to future accounting in existing estates as to new estates."

The circuit judge held that rents received for the use and occupation of the Kamehameha Schools was "income" within the meaning of that term as employed in the statute fixing the compensation of trustees and allowed commissions accordingly.

In their 58th annual account the trustees credited themselves with commissions on income from July 1, 1942, the opening day of the account, to May 11, 1943, the ef-

come, ten per centum for the first thousand dollars, seven per centum for the next four thousand dollars, and five per centum for all over five thousand dollars, such *commissions to be allowed upon each accounting when made* but not oftener than once a year."

sions *payable out of the income received during each year*, ten per centum for the first thousand dollars, seven per centum for the next four thousand dollars and five per centum for all over five thousand dollars, *such commissions to be payable as and when such income is received*, but said rates of ten per centum and seven per centum to be applied not oftener than once a year."

3 "Be It Enacted by the Legislature of the Territory of Hawaii:

"Section 1. Section 3793 of the Revised Laws of Hawaii 1935, as amended, is hereby further amended by inserting therein, following the first full paragraph thereof appearing on page 621 of said Revised Laws, the following paragraph:

fective date of Act 149 of the Session Laws of 1943, according to the schedule of rates contained in section 3793 as it existed prior to the amendment of May 11, 1943 and with commissions upon income from May 11, 1943 to June 30, 1943, the closing date of their annual account, according to the schedule of rates provided by the amendment of May 11, 1943, repeating the charges of 10% on the first $1,000 and 7% on the next $4,000, common to both schedules. The compensation of the trustees as thus computed was also allowed by the circuit judge.

The attorney general, a party to the proceeding below, appealed to this court, contending (a) that the trustees, having previously accepted commissions upon the cost of construction of the Kamehameha Schools as a "final payment" within the meaning of that term as employed in Revised Laws of Hawaii 1925, section 2544, and applied by analogy to compensation of trustees, were now estopped from charging commissions upon income received as rent for the use and occupation of the schools and that (b) while section 3793 of the Revised Laws of Hawaii 1935,

---

" 'Notwithstanding any other provisions of this section or of any other law, in the case of an estate of a charitable trust, the commissions of the trustees shall be limited to the following schedule of percentages on all moneys received in the nature of revenue or income of the estate, such as rents, interests, and general profits:

| | |
|---|---|
| 10% on the first | $ 1,000.00 |
| 7% on the next | 4,000.00 |
| 5% on the next | 100,000.00 |
| 3% on the next | 100,000.00 |
| 2% on the next | 300,000.00 |
| 1% on all over | 505,000.00; |

but said schedule of percentages shall be applied not oftener than once a year.

" 'Such trustees shall also be entitled to just and reasonable allowances for bookkeeping, clerical, and special services and expenses incidental thereto.'

"Section 2. This Act shall apply as well to future accounting in existing estates as to new estates."

*supra,* as it existed at the opening day of the accounting period, controlled up to May 11, 1943, the effective date of Act 149, that to the extent that the commissions charged during the period prior to the effective date of Act 149 included 10% on the first $1,000 and 7% on the next $4,000, such rates of commissions should not be again applied to income received upon and after May 11, 1943, the effective date of Act 149 and that the reduction effected by the Act of May 11, 1943 in commissions to which trustees of charitable trusts were entitled upon income in excess of $105,000 applied and the income received during the accounting period having upon May 11, 1943 exceeded $505,000 after that date the trustees were only entitled to 1% on the income received after May 11, the rate applicable under the amendment to income in excess of $505,000.

*Re* commissions on rents. No contention is made that the rents received by the trustees during both accounting periods for the use and occupation of Kamehameha Schools was not "income" within the meaning of that term as employed in Revised Laws of Hawaii 1935, section 3793, as amended, upon which the compensation of trustees of both private and charitable trusts are in part computable. The controversy centers upon the legal status of the capital (Kamehameha Schools) from which such rents accrue, resulting from the previous allowance to the trustees of commissions upon the moneys of the trust estate which created such capital. The attorney general contends that by the acceptance of commissions upon moneys of the trust estate expended in the construction of Kamehameha Schools as "final payments" the trustees are barred from asserting the right to commissions upon rents accruing from the Kamehameha Schools, such bar being in the nature of an estoppel *in pais.*

The facts constituting the bar upon which the attorney general relies are as follows: On October 10, 1925 the

trustees of the Bishop Estate filed a bill in equity in the circuit court of the first circuit praying the instructions of the court upon certain questions, two of which involved the issue upon this branch of the instant case, *viz.*, first, whether they were authorized under the will and codicils of their testatrix and trustor to disuse and dispose of the existing school buildings and plant and to erect and maintain in the place thereof new buildings and plant in accordance with certain proposed plans, and second, whether they would be entitled to charge and receive commissions as for final payment of moneys expended in the erection and maintaining of such new buildings and plant. The attorney general was made party respondent to the suit and duly appeared and answered admitting the allegations of the bill. Upon hearing had the circuit judge answered question one in the affirmative and question two in the negative. Upon appeal to this court both questions were answered in the affirmative. (See *Smith* v. *Lymer*, 29 Haw. 169.) Pursuant to final decree of this court, entered May 28, 1926, the trustees thereafter erected the Kamehameha Schools, from which these rents accrued and upon accounting were allowed commissions on the moneys expended as "final payments."

At the time that the bill of instructions was pending and up to the time of decree, no statutory provision existed providing for the compensation of trustees for services rendered by them on behalf of their trust estate. The right of trustees to compensation for such services, however, had long since been judicially recognized and, as said by this court in the case of *Smith* v. *Lymer, supra,* "By long and continued judicial construction, however, section 2544, R. L. 1925, which fixes the compensation of executors, administrators and guardians has been held to apply by analogy to trustees, and this construction is now so intrenched as to admit of no holding to the contrary." As a consequence

in legal effect all applications of trustees for services rendered by them on behalf of their trust estate for compensation to trustees were upon a *quantum meruit* and in the absence of facts requiring the application of a different measure of value the resort to the statute fixing the compensation of executors, administrators and guardians was deemed best calculated to determine the reasonable value of their services as trustees. So that had the facts required a different measure of value of the services to be performed by the trustees, the trustees would have been privileged to present the facts. As it was they apparently were satisfied to have the statute fixing the compensation of executors, etc. applied by analogy. That is what the circuit judge did. And upon the state of the record this court on appeal did likewise.

It was not until January 1, 1928, the effective date of Act 183 of the Session Laws of 1927, that the provisions of section 2544 of the Revised Laws of 1925 were, with certain other amendments with which we are not concerned, made expressly applicable to trustees. The provision for the allowance of commissions upon "final payment" was retained. What expenditures, if any, were incurred in the construction of the new schools between date of decree (May 28, 1926) and June 30, 1928, the end of the fiscal year, in which the existing law fixing the compensation of executors, administrators and guardians was amended to include trustees went into effect does not appear. The major portion of the money expended for that purpose was expended in later years. But inasmuch as the statute as amended by the legislature of 1927 retained the provision for the allowance of commissions upon "final payment" we shall assume that the trustees accepted commissions upon the moneys expended in construction of the present Kamehameha Schools as final payment as the term is employed in section 3793, *supra*, both before and after the amendment of 1927.

120

In my opinion these facts do not estop the trustees from asserting the right to commissions upon rents received from Kamehameha Schools. This court, in its opinion in the case of *Smith* v. *Lymer*, recognized the anomaly of the trustees of a perpetual charitable trust making "final payment" to themselves. It said: "It is obvious that in a perpetual trust such as is here involved, the trustees will never, strictly speaking, be called upon to make a 'final payment' to beneficiaries for at no time will it be the duty of the trustees to pay the balance of the trust estate into court 'or to the parties thereunto entitled.'" (p. 179) "It is true that when the proposed sale of lands shall have been made and the proceeds thereof devoted to the contemplated permanent improvements, the trustees will in reality have divested themselves of no portion of the corpus of the estate, and title to the new species of property acquired will be and remain in the trustees as fully as was title to the property sold." (p. 181)

Moreover, the court recognized the possibility of the future sale of the proposed improvements and the return to the trustees of proceeds of sale. Obviously, to such returned capital income might accrue. This court said: "The same will be true in case future developments necessitate the sale of the present proposed improvements, and the fact that in such event a portion of the funds now to be spent may perhaps be returned to the trustees * * * ."

In other words, the only question in respect to commissions propounded by the bill and construed by this court in the case of *Smith* v. *Lymer* was whether expenditures contemplated in the erection of the Kamehameha Schools should be considered upon the allegations of the bill as final payments within the meaning of the statute, despite the fact that the trustees retained title to the capital into which final payments were converted and there was a pos-

sibility, however remote, of income from the proceeds of reconversion. That the court did not anticipate the present contingency and the accrual of rents from the Kamehameha Schools or at least did not mention it as a possibility is beside the point. Its recognition of similar possibilities is sufficient and although it took pains to point out that the trustees were limited to but one final payment even though the trustees might again be called upon to replace the present schools with new school buildings, the opinion makes no mention of to what commissions the trustees might be entitled in the event of the accrual of the income from converted capital upon which commissions as for "final payments" had been allowed. Commissions since the effective date of the amendment of 1937 have been apparently allowed by the circuit judges having jurisdiction of the trustees' accounts, as final payments, as that term is used in section 3793, as amended, following the construction placed upon that term by this court in the case of *Smith* v. *Lymer*.

The facts, in my opinion, present no ground of estoppel. No inconsistency appears in the position now taken by the trustees in praying the allowance of commissions upon income in the shape of rents accruing from the Kamehameha Schools and the position formerly taken by them upon their bill for instructions. Nor by their acceptance of commissions upon such expenditures as final payments have they adopted a legal status of capital assets that precludes them from asserting the additional right to commissions upon income accruing from capital assets into which final payments have been previously converted. The defense of *res adjudicata* has not been raised and we expressly refrain from comment upon the legal effect, if any, of the decree in the case of *Smith* v. *Lymer* upon this issue.

*Re* rates of commissions on income generally. In my

opinion the compensation of trustees for the fiscal year ending June 30, 1943 is governed by the provisions of Act 149 of the Session Laws of 1943 and is measured by the graduated schedule of commissions contained in that Act upon the initial and succeeding amounts of income received by the trustees during the entire year ending June 30, 1943.

By the thirteenth article of the will creating the trust of which petitioners are trustees, it is provided that the trustees "annually make a full and complete report of all receipts and expenditures." Similar requirements have existed since January 1914, first by rule 20 of the rules of the circuit court of the first judicial circuit, to the circuit judge at chambers of which these trustees are accountable and later and since by the provisions of Laws of 1915, Act 101, amended by Laws of 1929, Act 169, incorporated in the Revised Laws of Hawaii 1935 as section 4713 and amended by the Laws of 1935, Act 154. The trustees account annually on June 30 of each year and presumably adopted the fiscal year ending June 30 of each year as their accounting period.

The general rule of law is that the compensation of testamentary trustees is governed by the law in force at the time of the settlement of their accounts.[4] It is also equally well settled that the commissions of trustees are to be allowed upon the settlement of their accounts and that their commissions cannot be legally taken before that time.[5]

The legal effect of an amendment during an accounting period changing the legal compensation of trustees is not a matter of first impression, the same question having been

---

4 Arnold v. Alden, 173 Ill. 229, 50 N. E. 704; Key v. Jones, 52 Ala. 238; Whitehead v. Draper, 117 N. Y. Supp. 539, 541.

5 Beard et al v. Beard et al., 140 N. Y. 260, 35 N. E. 488.

presented to this court in the *Estate of da Silva*, the opinion in which is contained in 31 Haw. 78. In that case the annual accounting period of the trustees ended May 8, 1928, at which time they filed their first annual account. The 1927 legislature amended the existing law fixing compensation of trustees effective January 1, 1928, the effect of which was to increase a rate of commission applicable. The amendment of 1927 contained the added provision: "These provisions shall apply as well to future accounting in existing estates as to new estates." In the *da Silva* case this court held that the law in effect upon accounting, *i. e.*, the law in effect upon and after May 8, 1928, and up to the date of decree, controlled. The amendment of May 11, 1943 contains the same additional provision. And it is reasonable to assume that the legislature in using the same language in Act 149 of the Session Laws of 1943 adopted the construction placed thereon by this court in the *da Silva* case. Hence, following the ruling in the *da Silva* case, section 3793 as amended by Act 149 of the Session Laws of 1943, is the measure of compensation to which these trustees are entitled for services rendered by them during the accounting period ending June 30, 1943, unless it may be said that the provision of Act 88 of the Session Laws of 1943, making commissions on income "payable as and when such income is received," altered the situation and entitled the trustees to take their commissions at the rates provided by the law existing at the time when the income upon which the commission is computed was received.

It must be obvious to the casual reader of section 3793 that compensation allowed trustees thereunder is for all the services performed by them in their fiduciary capacity during the annual accounting period. In other words, trustees are not paid commissions by way of compensation for the services rendered by them in each instance when income is received, as in the case of an ordinary collector,

but for all the services rendered by them on behalf of the trust estate during the accounting period. The method of applying fixed rates of commissions to income in addition to other commissions allowed upon capital is merely a means of determining compensation for all services rendered. It is not until the conclusion of the accounting period that the method of computation of the compensation of fiduciaries is complete and may become final.

By section 4713, *supra*, annual accounting by trustees is compulsory. By section 3644 of the Revised Laws of 1935 the circuit judges of the several circuit courts at chambers have power within their respective jurisdictions to hear and determine all matters in equity. By section 4701 of the Revised Laws of 1935 there is committed to the several circuit judges the power and authority to hear and determine in equity suits and proceedings for enforcing and regulating the execution of trusts. The provisions of law in respect to accounting by fiduciaries and the provisions of law in respect to the jurisdiction of the circuit judges at chambers synchronize, with the result that the accounts of fiduciaries including their charges for commissions are annually before the circuit judge at chambers for allowance and settlement.

The end to be accomplished by compulsory accounting is to secure the judicial liquidation and settlement of the affairs of the trust and to determine the rights of the trust estate against the fiduciary and his rights as against the trust estate. And the proceeding involves an adjudication upon each item of the account.[6]

The concepts of section 3793 in respect to annual compensation and the necessity of judicial allowance are retained in the amendment of April 30. It expressly provides, similarly as its predecessor, that the commissions

---

6 Hall v. Grovier, 25 Mich. 426, 436.

"shall be allowed." The word "allowed" connotes judicial action. Further, in the amendment appears language not theretofore employed limiting the payment of commission to "income received during each year."

Correlative to the right of fiduciaries to compensation for their services is the judicial power exercised by courts having jurisdiction over trusts to deny compensation in whole or in part to trustees guilty of neglect of duty, misfeasance or malfeasance in office. A trustee who has abused his trust forfeits his right to compensation.

At first blush it would seem that the prepositional phrase "to be payable as and when such income is received" is a contradiction of the word "allowed" but upon reflection the conclusion is inevitable that the language refers to two different things, i. e., payability and allowance. The definition and connotations of the word "allow" include consent, approval, sanction, as "to allow an item in an account."[7] Obviously, the allowance referred to is judicial allowance. Where statutes exist elsewhere upon the subject, judicial allowance of the compensation of fiduciaries is a uniform requirement.[8] Texas is the sole

---

[7] Funk & Wagnalls New Standard Dictionary.

[8] In the following cited statutes the verb "allow", in varying syntactical forms is employed uniformly in reference to the compensation of fiduciaries, in some instances the reference being to the substantive right of the fiduciary to compensation and in others to the power of the court to allow it: Ala. Code (1940) tit. 58, § 5; 3 Ariz. Code Ann. (1939) §§ 38-1402, 38-1404; 1 Pope's Dig. Stat. of Ark. (1937) § 183; Deering's Cal. Probate Code (1937) § 1122; 4 Colo. Stat. Ann. (1935) c. 176, § 232; Fla. Stat. (1941) § 734.01; 1 Idaho Code Ann. (1932) §§ 15-1105, 15-1107; 3 Idaho Code Ann. (1937) § 66-103; Ill. Rev. Stat. (1935) (Cahill & Moore) c. 3, § 135, c. 148, § 35; 3 Ind. Stat. Ann. § 6-1416; Iowa Code (1939) c. 509, § 12063; Me. Rev. Stat. (1930) c. 75, § 43; 23 Mich. Stat. Ann. § 27.3107; 2 Minn. Stat. (Mason 1927) § 7788; 1 Miss. Code Ann. (1942) c. 3, § 642; 1 Mo. Rev. Stat. (1939) § 220; 4 Mont. Rev. Code Ann. (1935) § 10287; 2 Rev. Stat. of Neb. (1943) § 30-1412; Nev. Laws 1941, c. 107, §§ 206, 207; 1 N. J. Rev. Stat. (1937) § 3:11-1; N. Y. Surr. Ct. Act, Thompson's Laws of N. Y. (1939) § 285; N. C. Gen. Stat. (1943) § 28-170; Throckmorton's Ohio Code Ann. (1940) Probate Code, § 10,506-52; Gen. Laws of R.

exception.[9]

No doubt, by making commissions on income "payable as and when such income is received" the legislature intended to permit fiduciaries to anticipate their commissions. But by the retention of the word "allowed" and the qualification of the word "income" by the participial phrase "received during each year" it is also clear that they did not intend to eliminate judicial allowance. Too close a scrutiny of statutory language more often than not creates confusion instead of clarity. But realistically it is inconceivable that the legislature intended to release fiduciaries from the necessity of judicial allowance of commissions charged by them and put surcharges against fiduciaries for commissions improperly deducted on the same plane as money judgments. If so, faithless insolvent fiduciaries could thumb their noses at the judges to whom they are called upon to account.

It is argued that by the language "such commissions to be payable as and when such income is received" contained in the amendment of April 30 and the deletion of the language "such commissions to be allowed upon each accounting when made" from the statute as it existed prior to amendment, created a vested right in the fiduciary to commissions upon income as and when the income upon

I. (1938) c. 580, § 7; 2 S. D. Code (1939) § 35:1603; Michie's Tenn. Code Ann. (1938) § 8292; Utah Code Ann. (1943) §§ 102-11-25, 102-12-32; Vt. Pub. Laws (1933) § 2819; Va. Code Ann. (1942) § 5425; Pierce Code Wash. (1939) § 9790; W. Va. Code Ann. (1942) § 4195; Wis. Stat. (1941) § 317.08; Wyo. Rev. Stat. (1931) §§ 88-2606, 88-2607.

Other statutes use similar terms, i. e., Ky. Rev. Stat. (1942) (Baldwin's) § 386.180; 2 N. M. Stat. Ann. (1941) § 33-1210; 3 N. D. Rev. Code (1943) § 30-2004; 2 Ore. Comp. Laws Ann. § 19-1009; "shall receive," N. C. Gen. Stat. (1943) § 28-170; "shall be entitled," Ga. Code (1933) § 113-2001, 1941 Supp. to Kan. Gen. Stat. (1935) § 59-1717; 2 Mass. Gen. Laws, c. 206, § 16, "shall have."

9 Vernon's Tex. Stat. (1936) c. 28, art. 3689. See Smith v. Belding, 237 S. W. (Tex. Civ. App.) 246.

which the commissions are computed was received. That may be so. But commissions also must be judicially allowed. To say that under Act 88 commissions when earned vest in the fiduciary is not enough. They must also be judicially allowed and the time when the judicial power to allow is invoked and not the time of payment controls the rates of commissions applicable.

If the amendment of April 30, 1943, making commissions upon income as and when the income upon which the commission is computed was received, operated to make commissions immediately payable in the sense that they were deductible when earned and a property right therein vested in the fiduciary entitled thereto, this did not, in my opinion, eliminate the necessity of judicial accounting. And if the necessity of judicial accounting remained and continued until final judicial allowance and settlement, then if there be accorded to the *da Silva* case all the implications explicit in its rationale, the time of accounting and not the time of payment of commissions controls and the schedule of commissions obtaining at the time of accounting and not the current schedule of commissions in effect at the time of payment apply.

If the commissions under Act 88 vest in the fiduciary when earned, it must be upon the theory that the statute creates a debt payable when earned. If so, as far as the necessity of judicial allowance is concerned, I see no difference between a debt payable to the fiduciary for services rendered and to be rendered by him as such fiduciary and a debt payable to another for services rendered on behalf of the trust estate. In the latter instance the fiduciary by payment merely discharges an indebtedness payable to a stranger while in the former by payment to himself he discharges an indebtedness payable to himself on behalf of the estate. That a trustee is not exonerated from liability and surcharge for the use of the funds of the estate

128

in the payment of expenses even though properly incurred until judicial allowance of payment is fundamental. I see no reason why the same rule should not similarly apply to the payment by a trustee of an indebtedness to himself.

Nor is it a matter of any special concern that the schedule of commissions upon receipt of income differs from that obtaining at the time of accounting. It is merely a matter of adjustment upon accounting of the deficiency or excess accordingly as the rates of commissions were by amendment reduced or increased. And if I am correct that the commissions computable upon income are but a part of the annual compensation for annual services, the schedule of commissions on income obtaining at the time of accounting applies to all income received during the accounting year.

That an absolute property in commissions earned does not vest in the fiduciary is apparent from the correlative power of courts having jurisdiction over trusts to which reference was heretofore made. Even if vested, commissions on income are subject to judicial divesture in whole or in part for cause. Without attempting to define the estate of the fiduciary in commissions earned on income prior to judicial allowance under the amendment of April 30 an absolute estate therein is not created. So that with whatever assurance, it may be said that commissions on income under the provisions of Act 88 were assignable or descendable, permitting their anticipation and deduction before judicial allowance, the necessity of judicial allowance remained and the law in existence at the time of accounting and not the payability of commissions controls in respect to the rates of commissions applicable.

To say that the legislature by making commissions on income payable immediately intended that the rule enunciated in the *da Silva* case should not apply, is to give to the use of the word "payable" an unusual and strained

construction at variance with the accompanying language contained in Act 88, inconsistent with the express provisions of Act 149, making that Act retrospective as well as prospective and in defiance of the power and authority reserved to circuit judges at chambers to enforce and regulate the execution of trusts.

Consistently with the views herein expressed, the decree of the circuit judge in respect to commissions on rents should be affirmed, otherwise reversed.

OPINION OF KEMP, C. J.

I concur in that part of the opinion of Mr. Justice Peters disposing of the questioned right of the trustees to commissions on the rents received for the use of the buildings of the Kamehameha School for Girls, but I am unable to concur in his conclusion as to the effect of Acts 88 and 149 on the rates of commissions to be applied to the income reported in the 58th account.

The 58th account as filed is for the period commencing with July 1, 1942, and ending with June 30, 1943.

During the period of the 58th account the trustees received income of $1,453,517.92. Of this amount $1,220,-763.70 was received during the period from July 1, 1942, to May 10, 1943, both days inclusive, and $232,754.22 was received during the remainder of the accounting period. On the total year's income of $1,453,517.92 the trustees took commissions of $70,103.27, computed as follows:

For the period ending May 10, 1943:

| | | |
|---|---|---|
| 10% on $ 1,000.00 | $ 100.00 | |
| 7% on $ 4,000.00 | $ 280.00 | |
| 5% on $1,215,763.70 | $60,788.18 | $61,168.18 |

For the remainder of the period:

| | |
|---|---|
| 10% on $ 1,000.00 | $ 100.00 |
| 7% on $ 4,000.00 | $ 280.00 |

| | | | |
|---|---|---|---|
| 5% on $ | 100,000.00 | $ 5,000.00 | |
| 3% on $ | 100,000.00 | $ 3,000.00 | |
| 2% on $ | 27,754.22 | $   555.09 | $  8,935.09 |

$70,103.27

By his answer the attorney general took the position that the trustees having received income in excess of $505,-000 prior to May 11, 1943, the date upon which Act 149 became effective, they were entitled to only 1% on the $232,754.22 received after May 10, 1943.

The circuit judge overruled the contention of the attorney general and approved the accounts as filed. In his appeal the attorney general has specified this ruling as error.

In disposing of the question of the correctness of the computation of commissions by the trustees, after reciting the facts and the contention of the attorney general, the court said: "The Court is of the opinion that the commissions taken by the Trustees are proper under section 3973 [sic] of the Revised Laws of Hawaii 1935, as amended by Act 149 of the Laws of 1943, and that the computation of the amount of commissions taken by the Trustees is a literal compliance with the statute."

In his brief and at the oral argument the appellant admitted that commissions were correctly calculated on all income received prior to the effective date of Act 149. No issue as to these commissions was raised below. In a memorandum filed after the oral argument he states that he had overlooked the decision in *Estate of da Silva*, 31 Haw. 78, which he discusses as follows:

"The only difference between the situation in the da Silva case and the present case is that there the commissions were increased but here they were decreased, plus the fact that a part, though not all, of the commissions allowable here have been affected by the enactment of Act

88, S. L. 1943. The da Silva case establishes the proposition that all commissions are to be allowed at the lawful rate in existence at the time of the accounting. In this case the rate would be that of Act 149. Act 88 affects this situation to the extent of giving a vested right in commissions at the rate provided in Section 3793, R. L. 1935, during the time after the effective date of Act 88 (April 30, 1943) and before the effective date of Act 149 (May 11, 1943). Whether a vested right came into being in commissions on income received before April 30, 1943, depends on whether Act 88 is given a retrospective operation. Section 4, R. L. 1945, provides that no law shall have a retrospective operation."

At the beginning of the accounting period the statute, section 3793, Revised Laws of Hawaii 1935, provided that "Upon all moneys received in the nature of revenue * * * trustees * * * shall be allowed as commissions * * * ten per centum for the first thousand dollars, seven per centum for the next four thousand dollars, and five per centum for all over five thousand dollars, such commissions to be allowed upon each accounting when made but not oftener than once a year."

Section 3793 was amended by Act 88 (C-107), Session Laws 1943, effective April 30, 1943. This Act amended the paragraph of said section just quoted to read as follows: "Upon all moneys * * * received in the nature of revenue * * * trustees * * * shall be allowed as commissions payable out of the income received during each year, ten per centum for the first thousand dollars, seven per centum for the next four thousand dollars and five per centum for all over five thousand dollars, such commissions to be payable as and when such income is received, but said rates of ten per centum and seven per centum to be applied not oftener than once a year."

The significant change in section 3793 effected by Act

132

88 was the elimination of the phrase "such commissions to be allowed upon each accounting when made but not oftener than once a year" and substituting therefor the phrase "such commissions to be payable as and when such income is received, but said rates of ten per centum and seven per centum to be applied not oftener than once a year."

The change effected by Act 88 was in the method of procedure for the payment of trustees' commissions on income received and authorized the trustees to *take* their commissions on all income received when income was received. Act 149, Session Laws 1943, which set up a new schedule of commissions for trustees of charitable trusts, became effective on May 11, 1943, before the trustees filed their 58th account, and the application of the rates prescribed by that Act will be considered later.

If Act 88 authorized a trustee to immediately take his commissions on unreported income received prior to the effective date of said Act, then the title of the trustee in the commissions at the then prevailing rate became vested. To have this effect Act 88 must be given a retrospective operation.

Section 4, Revised Laws of Hawaii 1945, which provides that "No law shall have a retrospective operation" does not prevent Act 88 from applying to income received prior to the effective date of that Act. Article 71 of the constitution of the Republic of Hawaii provided that, "Except as herein provided, no Retrospective Law shall ever be enacted," and that section of the constitution was construed in *Peacock* v. *Haw. Rep.*, 11 Haw. 404, from which I quote: "To hold that every law that 'looks backward' is unconstitutional, would be absurd; it would tie the hands of the Legislature so as to prevent all sorts of salutary laws harmful to no one. 'Retrospective laws' have, therefore, come to have much the same meaning as 'ex *post facto* laws,' 'laws impairing the obligation of contracts,' &c. While these

phrases apply in whole or in part to different subject-matters, they in general mean laws that impair vested rights; and in general so long as laws do not impair vested rights they are not unconstitutional because retrospective." *Oleson* v. *Borthwick*, 33 Haw. 766, and *Palea* v. *Rice*, 34 Haw. 150, are to the same effect. Section 3577, Revised Laws of Hawaii 1935 (§ 9578, R. L. H. 1945), provides that "The several courts, in their decisions, shall have due regard to vested rights."

In the case of *In re Potter*, 175 N. Y. S. 598, the court, in discussing the general rule of statutory construction to the effect that "it takes a clear expression of legislative purpose to justify a retroactive application," said: "This general canon of construction is subject to an exception as broad and distinct as the rule itself. This exception is that the legislature has the right to pass laws changing the form and method of procedure, and that such changes affect cases and conditions arising before the change in the absence of words of exclusion.

"The rule, then, is that it takes a clear expression of the legislative purpose to justify a retroactive reading of a law only when the enactment tends to destroy or impair a vested right, or to give a right when none existed, or to impose a liability not previously known; but legislation which affects only the remedy or procedure applies to a pending action or condition which came into being before the passage of such legislation, unless words of exclusion are found in the statute."

*In re Potter* involved an amendatory Act which allowed a commission on "the value of real or personal property received, distributed or delivered," whereas prior to the amendment no commissions were allowed on the value of property received but only on the value of property distributed or delivered.

After the effective date of the amendatory Act the

trustees filed their accounts which showed that they received real estate prior to the date of the amendment allowing commissions for receiving real estate. They claimed and the court allowed commissions for receiving the real estate under the amendatory Act and held that the allowance of commissions is a mere matter of procedure.

By analogy the foregoing cases support the thesis that the trustees were authorized by Act 88 to immediately take commissions on income received prior to the effective date of said Act at the then prevailing rate, and if perchance a trustee took more commissions than the statute authorized, the remedy would be a decree requiring him to refund the excess.

When Act 88 took effect it applied to trustees of charitable trusts as well as to trustees of private trusts. It neither contains words of exclusion nor tends to destroy or impair a vested right. The rule of *In re Potter, supra,* therefore applies and justifies the application of Act 88 to commissions on income received prior to the effective date of said Act. The then statutory commissions on income received prior to the effective date of said Act became immediately payable. Ballentine defines "vested right" as follows: "A right is vested when there is an ascertained person with a present right to present or future enjoyment." Ballentine, *Law Dictionary.* Act 88 gave trustees a present right to present enjoyment of commissions on income immediately upon receipt of income. The right of trustees to the statutory commissions on income immediately upon receipt of income is therefore a vested right.

Obviously, the trustees were entitled to their commissions on income received after April 30, 1943, and prior to May 11, 1943, at the rates prescribed in Act 88, payable as and when such income was received.

I think I am further supported in my view of the effect of Act 88 by the report of the judiciary committee on senate

bill number 3, which became Act 88. The committee said:

"The present language of the statute is that commissions on income shall be 'allowed upon each accounting when made but not oftener than once a year.'

"It has been customary in the past to collect the commissions as they were earned, but to have the account allowed annually.

"A question of construction has now arisen, however, and it has been ruled in some courts that the fiduciary must await the allowance of his annual account before he is entitled to his commissions.

"The purpose of this bill is to clarify the meaning of the statute and to make it apparent that the commissions are payable as and when the income is received. The provision that the upper bracket of the statutory allowance of commissions is to be applied only once a year is retained." Sen. Jo. (1943) p. 449.

This leaves the question of the effect of Act 149 on our problem.

This Act amended section 3793, as amended, by inserting therein the following: " 'Notwithstanding any other provisions of this section or of any other law, in the case of an estate of a charitable trust, the commissions of the trustees shall be limited to the following schedule of percentages on all moneys received in the nature of revenue or income of the estate, such as rents, interests, and general profits:

10% on the first ................................. $   1,000.00
7% on the next ................................. $   4,000.00
5% on the next ................................. $100,000.00
3% on the next ................................. $100,000.00
2% on the next ................................. $300,000.00
1% on all over ................................. $505,000.00;

but said schedule of percentages shall be applied not oftener than once a year.

" 'Such trustees shall also be entitled to just and reasonable allowances for bookkeeping, clerical, and special services and expenses incidental thereto.'

"Section 2. This Act shall apply as well to future accounting in existing estates as to new estates.

"Section 3. This Act shall take effect upon its approval."

It may be conceded that but for Act 88 a trustee reporting after the effective date of Act 149 would be limited to the schedule of percentages prescribed by Act 149 in calculating his commissions on all income not theretofore reported. This would seem to follow from the decision in *Estate of da Silva*, 31 Haw. 78, but in that case the procedure created by Act 88 was not present.

Act 149, like Act 88, contains no words of exclusion but unlike Act 88 it would, if given a retrospective operation, destroy or impair a vested right. If so applied it would impair the vested right of the trustees to retain the commissions which they had taken as they were authorized to do by Act 88. Act 149 cannot therefore be given a retrospective operation.

Consequently, the calculation of commissions by the trustees on income received prior to May 11, 1943, and approved by the circuit judge, was in strict compliance with the applicable statute.

The question of the application of Act 149 to the reported income received after May 10, 1943, is more difficult of solution.

If the trustees had elected to ask permission of the chancellor to change their accounting period to begin on the effective date of Act 149, such permission would no doubt have been granted and their 58th account would have terminated on May 10, 1943, leaving the income received after that date to be reported in their first report thereafter with commissions calculated in accordance with the

graduated scale of percentages prescribed by that Act.

They did not elect, however, to change their accounting period and have combined in their 58th account the income received both before and after the effective date of Act 149 and it therefore becomes necessary to determine whether the applicable provisions of both Act 88 and Act 149 have been applied to the income received after Act 149 became effective.

Acts 88 and 149 are *in pari materia* and must be construed together.

Act 88 prohibits the application of the 10% and 7% rates oftener than once a year. The commissions taken by the trustees and approved by the decree run counter to this provision.

It does not follow, however, that the 1% rate must be applied to all income over $505,000 received after Act 149 became effective, as contended for by the attorney general.

The trustees included $232,754.22 of income received after Act 149 became effective and $1,220,763.70 received prior thereto in their 58th account.

In calculating their commissions on the income received prior to the effective date of Act 149, they applied the 10% rate to the first $1000 and the 7% rate to the next $4000. They also applied the 10% rate to the first $1000 and the 7% rate to the next $4000 received after Act 149 became effective, all in the period of one year. This is forbidden by Act 88.

However, it is my opinion that the double application of the 10% and 7% rates within the year is the only objection to the 58th account as filed and approved by the decree. The rates of commissions prescribed by Act 149, after the first $5000, are 5% on the next $100,000, 3% on the next $100,000, and 2% on the next $300,000. Having applied the 10% and 7% rates once, the applicable rates to the income received after Act 149 became effective be-

gins with the 5% rate. If I am correct in my conclusion that the 10% and 7% rates having been applied to the income received prior to May 11, 1943, should not have been again applied to the income thereafter received within the year, then the application of the schedule of Act 149 to the $232,754.22 received after said Act became effective would be as follows: ·

| | | |
|---|---|---|
| 5% on $100,000.00 | ............................ | $5,000.00 |
| 3% on $100,000.00 | ............................ | $3,000.00 |
| 2% on $ 32,754.22 | ............................ | $ 655.08 |

Total, $8,655.08

My conclusion is that the decree approving commissions on income, including the questioned rents received prior to May 11, 1943, should be affirmed; and as to commissions on income received thereafter, the decree should be reversed and the cause remanded, with instructions to modify the decree in accordance with the views herein expressed.

### OPINION OF LE BARON, J.

I join Mr. Chief Justice Kemp in concurring in the opinion of Mr. Justice Peters to the effect that no legal bar exists to estop the trustees from taking statutory commissions on rents received for school buildings leased to the federal government during periods covered by the trustees' 57th and 58th annual accounts. I concur with the chief justice that a right vested in the trustees by authority of Act 88 of Session Laws 1943 (now R. L. H. 1945, § 9757) to take payment of commissions at the percentage rates prescribed by it on all income received while such rates were applicable to charitable trusts during the beginning portion of their 58th annual account period and that the legislature did not intend to disturb such right by subsequently changing those rates in the enactment of

Act 149 of Session Laws 1943 (now R. L. H. 1945, § 9758), but dissent from his application of the third, fourth and fifth percentage rates of Act 149. in respect to the balance of the year's income received during the latter portion of the accounting period beginning with the effective date of Act 149 which application in my opinion is violative of its legislative intendment. I concur with Mr. Justice Peters in his construction of Act 149 that it operates prospectively under which its last percentage rate is applicable to such balance but dissent from his construction that that Act also operates retrospectively under which he applies its first five percentage rates on the income received prior to the effective date of the Act, such construction and application in my opinion being without due regard to the right vested by authority of Act 88 and the legal character of past payments of commissions at the rates prescribed by that prior legislation.

Any method of computing trustees' commissions is in itself purely a matter of procedure but a change therein by statute reducing such commissions would be a matter of substance in respect to rights which had already vested under the old method. This is clearly apparent in regard to rights to commissions, computed at existing statutory rates, which have been approved and allowed by the court prior to enactment of the statute changing those rates. The question, however, presented by this appeal does not concern rights vested judicially but does concern those vested by authority of legislative enactment during the accounting period and before the statute changing the method of computation in reduction of commissions was in existence. In the absence of such intervening legislation, the application of the statute edicting the change is strictly that of an adjective law, which when in force at the time of allowance of an account controls the computation of commissions for the entire accounting period and

applies retrospectively to reported transactions anteced-
ent to the statute's enactment in the absence therein of
words of exclusion. (*Estate of da Silva*, 31 Haw. 78; *In
re Potter*, 175 N. Y. Supp. 598.) Yet, it is not a true
retrospective law nor has it retrospective operation in the
sense that it reverts to and modifies a pre-existing state of
right. It rather is prospective in the sense that it applies
only to a ruling to be made in the future, albeit with re-
trospective application in respect to transactions in the
past which come up for adjudication. On the other hand,
in the case where the operation of a law would revert to
and modify a pre-existing state of right, pertinence of the
general canon of construction becomes evident that it takes
a clear expression of legislative purpose to justify any
retrospective operation that would tend to destroy or im-
pair a vested right, the basic presumption being that the
legislature does not intend to enact laws which operate
oppressively and unreasonably. This is consonant with
the presumption that the legislature intends to enact pros-
pective laws unless the contrary intent is expressed or
necessarily implied. Such rule of construction where a
contrary intention does not appear is a matter of statute
in this jurisdiction. (See R. L. H. 1935, § 5, now R. L. H.
1945, § 4, which reads: "No law shall have any retro-
spective operation.") It is within the well-recognized
principle that retrospective laws are not favored and that
all laws will be construed as being prospective unless the
language employed imperatively requires a contrary con-
struction. (See *Oleson* v. *Borthwick*, 33 Haw. 766; *Robin-
son* v. *Bailey*, 28 Haw. 462; *In re Kalana*, 22 Haw. 96,
107.) Thus where retrospective operation would tend to
prejudicially affect a vested right or the legal character
of past transactions and no language in the statute chang-
ing the method of computing commissions either directly
or indirectly indicates an intention to operate retrospec-

tively, the statute should be construed as a prospective law. When applied to an account rendered after its enactment such statute so construed would not operate to modify the legality of past takings of commissions, the right to which vested by authority of prior legislation at the then existing rates of computation.

During the accounting period of the trustees' 58th annual account covering the fiscal year beginning July 1, 1942 and ending June 30, 1943, Acts 88 and 149 were enacted. Act 88 became law on April 30, 1943. It authorized a course of action for the taking payment of commissions by trustees generally but continued the existing method of computing such commissions. Act 149 became law on May 11, 1943. It did not alter the course authorized by Act 88, but changed the existing method of computing commissions in charitable trusts where the income is over one hundred and five thousand dollars. Thus the course and change inaugurated by these two amendatory Acts were in force and applicable to charitable trusts at the time of allowance of the 58th annual account and have not since been repealed or amended. Neither Act contains words of exclusion. Consequently in that they both relate to procedure, the Acts should be given retrospective application in the sense of applying to future rulings concerning past transactions unless such would retroact against a vested right. Although conceded and patent that no vested rights would be disturbed retrospectively by application of Act 88 to the 58th annual account, it is urged that by virtue of the authority of that intervening Act a vested right accrued with which a retrospective operation of Act 149 would interfere. Consequently whether such a right did vest and would be so affected must first be ascertained before the legislative intent of Act 149 in respect to its operation can be determined.

The legislative purpose of Act 88 is to legalize the past

practice of taking commissions at applicable rates on portions of the annual income as they are received and to make it apparent that such commissions are then and so payable regardless of whether the trust is a charitable or an ordinary one. (See Sen. Jo. 1943, p. 449.). It amends section 3793 of Revised Laws of Hawaii 1935, continuing the existing method of computing commissions but omitting the provision that "* * * such commissions to be allowed upon each accounting when made * * *" and substituting the new provision that "* * * such commissions to be payable as and when such income is received * * *." This substitution invokes a change of procedure without affecting any pre-existing state of right. It creates a divergence from the time an account is rendered to the times throughout the accounting period when portions of the year's income are received whether it be from day to day, month to month, or one part of the year to the next. Thus relating to procedure with no words of exclusion, the Act applies retrospectively to the trustees' 58th annual account in respect to past payments of commissions on income received at the existing rates continued by the Act so long as those rates are applicable to charitable trusts. However, before the period covered by their account terminated, Act 149 became effective and changed the method of computing commissions in charitable trusts. Hence, thereafter the rates continued by Act 88 are inapplicable to charitable trusts and consequently Act 88 applies retrospectively to only those past payments reported by the account on income received before the effective date of Act 149. During that time, income was received and the trustees were lawfully entitled by Act 88 to take payment of commissions thereon at the then applicable rates continued by it. Such legislative authority endowed them with substantially a right of property to a sum of money made certain by a fixed method of computation, the right

to be enjoyed instantly. This right was complete and consummate before Act 149 came into existence. It is a right vested by statute and a right so closely attached to applicable rates of computation that any retrospective and reductive change therein by subsequent legislation would impair it and prejudically affect the legality of past payments of commissions in exercise of it. Such is the statutory right with which retrospective operation of Act 149 would interfere.

The primary problem confronting this court is that of construing the legislative intent of Act 149 relative to its retrospective operation. In this connection it is unnecessary to decide what effect the vesting authority of prior legislation may have had upon the powers of the presiding chancellor in relation to the right vested by it when an account subsequently comes before him for adjudication. Likewise it is unnecessary to decide whether that right may be subsequently disturbed by him, this court being concerned not with judicial disturbance but with legislative interference. Suffice it to say that every adjudication involving vested rights no matter how vested necessarily implies a judicial inquiry into all the material circumstances surrounding the vesting thereof in the exercise of the court's ancient function to determine as a matter of law that such did vest and, upon affirmative determination thereof, their protection becomes the court's duty unless there be equities outweighing such duty, the courts of this territory being specifically required by statute to have in their decisions "due regard to vested rights." (R. L. H. 1935, § 3577, now R. L. H. 1945, § 9578.) In my opinion, such duty and requirement, however, does not infringe upon any of the chancellor's powers in equity to enforce and regulate the execution of trusts or to scrutinize the account of the trustees and see that it adheres to the purposes of the trust and complies with the law. His powers

of supervision remain unaffected. He may decide that the full amount of commissions taken was not granted by statute and surcharge the difference. He may find the services not commensurate with the right vested by statute. He may conclude that the trustees are guilty of malfeasance and misfeasance in office resulting in irreparable harm. He may strip or deprive the trustees of commissions taken and order them refunded, but he cannot modify the legal character of the original taking nor alter the fact that the right thereto at the then applicable rates did vest on the receipt of income upon which such were computed.

The legislative purpose of Act 149 is to distinguish between the aggregate commissions to be paid trustees in charitable trusts and those in ordinary trusts where the income is over one hundred and five thousand dollars, no distinction being made where the income is not over that amount. (See Sen. Jo. 1943, p. 538, and compare the Act's percentage rates and apportionments of income with those continued and provided by Act 88.) This purpose is accomplished by amending Act 88 so as to separate charitable trusts from ordinary ones and to limit commissions to be charged by trustees in charitable trusts to a new method of computing such commissions. This method retained the existing first two higher percentage rates and first two lower brackets of income first received as continued by Act 88 but confined Act 88's last and third percentage rate of five per cent which that Act applied to all over five thousand dollars to a new bracket of the next one hundred thousand dollars and then limited commissions to three new and descendingly lesser rates on income received thereafter. Such automatically would reduce the aggregate commissions of trustees in charitable trusts from those in ordinary trusts when the income exceeds one hundred and five thousand dollars. The Act therefore may be interpreted as a prohibition against applying the old

rate of five per cent on the excess income and a requirement that the new and lesser rates be applied in its place.

In that as a matter of fact a part of such excess as reported by the trustees' 58th annual account was received prior to the effective date of the Act on which as a matter of law the right to take payment of a commission at the rate of five per cent vested by authority of Act 88, a retrospective operation of Act 149 would interfere therewith and prejudicially affect the legal character of the past taking of such payment. Consequently there being no expression of legislative intent or necessary implication thereof that the change of method of computation provided by Act 149 should operate in retrospect to prohibit the taking of payment at the old rate on that part of the excess income which was received in the past or require the application of the new and lesser rates thereon, the general canon of construction is applicable, it being presumed that the legislature had knowledge of Act 88 and did not intend subsequently to take away or impair a right vested by the authority of such prior legislation. The Act therefore must be construed as being a prospective law. Thus construed it does not operate unjustly against a vested right but operates only to prohibit trustees of charitable trusts from taking further payment of commissions at the rate of five per cent on that part of the income reported in their annual account which is over one hundred and five thousand dollars and received on and after the effective date of the Act on which excess there is a requirement to immediately employ instead of the superseded old rate three new and lesser rates thereafter as they may be applicable until the end of the accounting period.

Hence it follows that the lower court properly approved the payment of commissions in the trustees' 58th annual account at the rates of computation prescribed by Act 88 on income first received from the beginning of the account-

ing period up to the effective date of Act 149, the approval being in protection of and in due regard to the legal character of the past taking of payment of a commission on such income which is over one hundred and five thousand dollars at the rate of five per cent, as well as the right to do so which vested by authority of Act 88, and being in harmony with the prospective operation of Act 149 and its construed legislative intent to leave such character and right intact.

In respect to the final portion of the income received thereafter to the end of the accounting period, the lower court approved commissions thereon at the first five higher rates of percentages prescribed by Act 149. The appellant specifies such as error, contending that the last and lowest percentage rate should have been applied. In my opinion the appellant's position is well-founded.

Section 4713 of Revised Laws of Hawaii 1935 (now R. L. H. 1945, § 12574) makes it compulsory to file annual accounts, article thirteen of the will creating the trust requiring the trustees to do substantially the same thing. Act 88 expressly designates the income as being "received during each year." It brackets that income into two successive and graduated segments first received together with all the income thereafter and correlates such divisions to three descending rates of percentages respectively for the purpose of computing the aggregate commissions to be charged on the total income received for the year. Act 149 adopts the first two lower brackets prescribed by Act 88, as well as its correlated first two higher percentages, and provides three additional brackets, together with all the income received thereafter, to which it correlates three lesser rates of percentages. It thus makes six divisions of income instead of three, each synchronized to a different percentage rate, for the purpose of not only computing the aggregate commissions to be charged but also

to reduce such commissions in charitable trusts from those allowable in ordinary trusts. Act 149 refers to "income of the estate" without designating whether it is the annual income or stating the period during which such is received. Construing the Act *in pari materia* with section 4713 and Act 88 as a part of the same law within a harmonious system of laws the word "income" can mean only annual income, which is the income received during the period covered by an annual account. Each of its brackets in addition to the excess of the total of such bracketed portions thus designates a definite segment of the whole of the annual income received and, after the first one, each segment depends for its significance upon the one immediately preceding. Comparably, each percentage rate represents in orderly sequence a step in the computation of the aggregate commissions on the total annual income, attaching and becoming applicable as such income progressively reaches and goes beyond the point at which its correlative bracket begins until the next succeeding rate attaches and applies accordingly. To apply a percentage rate to a segment of the annual income to which the rate is not correlated by the Act would violate its intendment and either impair the right of the trustees to be paid a higher commission or unjustly enrich them at the expense of the trust estate. The application of the proper percentage rate to a particular segment of the year's income is a severable matter and not one pertaining to the application of the entire schedule of percentages "oftener than once a year" as prohibited by the Act. It depends upon an interpretation of the clear language and meaning of the statute in setting forth that schedule and in correlating it with the integrated scale of successive and graduated segments of annual income. Hence the prohibition against more than one application of the percentage schedule within a year is not material nor is the prohibition of Act 88

against applying its first two higher rates oftener than once a year either material or applicable to the application of the proper rate in Act 149's schedule to a particular segment of the annual income.

The total annual income received during the accounting period of the trustees' 58th annual account is $1,453,517.92, of which $1,220,763.70 was received prior to the effective date of Act 149 and $232,754.22 thereafter. In other words the receipt of the $232,754.22 immediately followed that of the $1,220,763.70 to complete the year's income of $1,453,-517.92. It is apparent that it is well "over five hundred and five thousand dollars" and that therefore the only applicable rate to such excess income is that of "one per centum" as correlated thereto by the Act. Hence the Act entitles the trustees to be paid a commission in final settlement of the aggregate commissions for the year at that rate in respect to the $232,754.22 last received and nothing more, the trust estate having a reciprocal right not to be charged thereon at a higher rate.

The lower court in effect considered, contrary to fact, that the $232,754.22 is the first part of the annual income received instead of the last part. This resulted in the erroneous application of the first five higher percentage rates of Act 149 instead of the last and lowest, in spite of having approved and allowed commissions on all the first part of income in the sum of $1,220,763.70 at the rates prescribed by Act 88. Hence it is apparent that the lower court's final settlement of the aggregate commissions for the year ending June 30, 1943, prejudiced the estate and is in error. The trustees' 58th annual account should therefore be remanded for further proceedings consistent with this opinion, with which those of the other justices are alternately in harmony.

Consequently, in accordance with the determinant which the opinion of Mr. Justice Peters, that of Mr. Chief

Justice Kemp and mine collectively have upon this appeal, it is the order of this court that the portion of the appealed-from decree of Honorable A. M. Cristy entered December 15, 1944, which approved and allowed the trustees' 57th annual account be affirmed, that portion dealing with their 58th annual account which approved and allowed commissions on income received prior to May 11, 1943, the effective date of Act 149, be also affirmed, but that portion dealing with their 58th annual account which allowed and approved commissions in respect to income received on and after such effective date be reversed and the cause remanded with instructions to modify said decree so as to limit the computation of a commission in respect to such income to the rate of one per cent, the several justices unanimously agreeing that the trustees are entitled to statutory commissions on rents received from the school buildings leased to the federal government reported as a part of the annual income in both accounts, the majority of the justices in their written opinions agreeing that the commission in respect to that segment of the annual income received on and after the effective date of Act 149 as reported in the 58th annual account is limited to and should be computed at the rate of one per cent, and all the justices concurring in the conclusion that the foregoing remand represents the composite result of their opinions.

*J. M. Richmond*, Deputy Attorney General (also on the briefs), for appellant.

*A. G. M. Robertson* (*Robertson, Castle & Anthony* on the briefs) for appellees.