In the Matter of the Estate of BERNICE PAUAHI BISHOP, DECEASED

No. 5119

July 28, 1972

RICHARDSON, C.J., MARUMOTO, ABE, LEVINSON AND KOBAYASHI, JJ.

OPINION OF THE COURT BY LEVINSON, J.

This is an appeal from an order approving the 83rd Annual Account of the trustees of the Bishop Estate. Appeals have been filed by the Attorney General and by the Master appointed by the court to review the account.

The first issue raised by the Attorney General is whether the Estate's trustees may take commissions on amounts received by the Estate but paid to the State for property taxes levied on commercial property. The attorneys for the Estate's trustees argue that the issue is not properly before us. They contend that the Attorney General has asked for an "advisory opinion" and that the matter does not present a justiciable "case of controversy." Alternatively, they argue that it is entirely proper for the trustees to take commissions

on the real estate taxes in question.

In an action for an accounting, a court of equity is called upon to determine the propriety of every entry in an estate's account. The court may invoke any one of a number of remedial measures to correct an improper entry. It may allocate funds among income and principal; it may surcharge the trustees for improper management; it may redetermine the amount of trustees' commissions. In many instances, even though the court has found a clear error in an account, it may exercise its discretion to invoke no remedy, simply directing the trustees to adopt a different accounting practice. *See, e.g., In re Bishop Estate,* 36 Haw. 403, 425-26 (1943). Thus, one of the very functions of a court in an accounting proceeding is to advise the trustees on the propriety of continuing their present practices. *In re Bishop Estate,* 36 Haw. 403 (1943).

In any event, the fact that the Attorney General has for unknown reasons decided to question the manner in which the commissions are computed without also requesting the obvious relief of a surcharge would not prevent us from granting all appropriate relief. As the court said in *Griffith v. Cooper,* 145 Colo. 439, 442-43, 359 P.2d 360, 362 (1961), ". . . a suit in equity for an accounting constitutes an exception to the general rule that affirmative relief will not be granted to a defendant unless he makes a claim to it . . . ." *Accord, Hochen v. Rubin,* 24 A.D.2d 254, 265 N.Y.S.2d 554 (1965), *aff'd* 18 N.Y.2d 866, 276 N.Y.S.2d 119 (1966). Apart from the traditional equity rules, Rule 54(c) of the Hawaii Rules of Civil Procedure has specifically provided that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." That rule is especially appropriate to protect the Estate's beneficiaries where the Attorney General has appeared as their representative, but for unknown reasons has failed to demand appropriate relief.

Turning to the merits of the issue raised, we reject the Attorney General's position that sums collected from lessees

and paid to the State for real property taxes imposed on commercial property are not income to the Estate.[1] HRS § 607-20 (1968) provides that commissions may be taken "on all moneys received in the nature of revenue or income of the estate, such as rents, interests, and general profits." Amounts paid by lessees as "rents" are "in the nature of revenue and income." The fact that some portion of the amount received must be paid to the State for taxes does not change the nature of the amount received. Were we to accept the Attorney General's position, we would be constrained to deduct all expenses from all amounts received and compute commissions on the basis of the Estate's net income. Such is not the intent of the statute. We share the Attorney General's concern over the fact that the trustees' yearly commissions are increasing dramatically. Between 1968 and 1969 alone, each trustee's share of the commissions jumped from $34,948 to $50,187[2] and all indications point to further increases.[3] The question of whether the formula used in computing trustees' commissions should be re-examined, however, is a legislative problem, and we are unable to reduce the amount of commissions awarded in the absence of legislative action.

---

[1]The trustees do not charge commissions on amounts collected for taxes on residential property covered by HRS § 246-4. Since the tax under that section falls directly on the lessees, amounts received by the Estate as a collection agent and forwarded to the government never become "income" to the Estate. By contrast, where the tax is imposed on the Estate, amounts received by the Estate are income, even though some portion of the amount must be paid to the Estate as an expense. Computation of trustees' commissions does not depend on the fact that the trustees have performed services for the Estate but on the fact that "income" has been earned.

[2]Summary of Receipts, Schedule "A," at page 28 of Eighty-Second Annual Account, Vol. 22 of Circuit Court's File in Docket No. 2048, p. 41, and Summary of Receipts, Schedule "A" at page 29 of Eighty-Third Annual Account, Vol. 23 of Circuit Court's File in Docket No. 2048, p. 38.

[3]Previous to 1967 the Estate received an annual rental on the Royal Hawaiian Hotel property of $25,000 per year. Beginning in 1976, the annual rental will be increased to $1,170,000 per year. This increase alone will give each trustee an increase in additional yearly compensation of almost $4,600, and is but one example of the need for reevaluation of the schedule used to compute trustees' commissions.

Another major question raised in this appeal concerns the trial judge's decision to award a master's fee of $6,000.

The Master testified at trial that he felt his services were worth $15,000 but that he considered one third of his time "a public service contribution" and asked for a fee of $10,000. The trial judge felt that much of the master's report dealt with matters beyond the scope of the accounting and awarded a fee of only $6,000.

Much of the Master's problem arises from the fact that, as he himself puts it, he was "caught between the conflicting positions of the Attorney General and the Circuit Judge." While the judge's master does not ordinarily examine such matters as the reasons why "youngsters of Hawaiian culture . . . encounter difficulty in an educational system," the Attorney General had apparently given the Master directions to make a study of the administration of the Kamehameha Schools. For obvious reasons, the Master found himself unable to comply simultaneously with his conflicting duties.

The coverage of a Master's report should properly be limited to the matters which may be dealt with by an equity court in an accounting proceeding. Such a court may interfere with the trustees' administration of a trust only when it finds an abuse of the trustees' discretion or a violation of law. RESTATEMENT, TRUSTS (SECOND) §§ 187 and 382 (1959). There may, of course, be occasions when an equity court would request an extensive sociological treatment of the Kamehameha Schools. Whether an equity court should require its own reports after so many exhaustive studies have already been conducted[4] must be determined by weighing the benefits to be gained from additional reports against the fact that the reports are expensive. In any event, the trial judge did not in this case authorize an extensive review of the policies of the Kamehameha Schools. While the report submitted by the Master is well written and perceptive, we cannot

---

[4]During 1968 and 1969 alone seven separate studies of policies of the Kamehameha Schools were conducted. Trustees' Ex. 1, Vol. 24, Circuit Court file in No. 2048, p. 205.

say that the court abused its discretion in awarding a fee of only $6,000.

We do not reach or intimate any opinion on the issues discussed in Mr. Justice Abe's concurring opinion for the reason that those issues were neither raised in the trial court nor argued in this court.

The trial court's order approving the Eighty-Third Annual Account of the trustees of the Bishop Estate and awarding a master's fee is affirmed.

*Tany S. Hong* and *Shirley Smith*, Deputy Attorneys General (*George Pai*, Attorney General of counsel) for appellant, cross-appellee.

*Boyce R. Brown* (*Moore, Torkildson & Schulze* of counsel) for Master-appellee, cross-appellant.

*J. Garner Anthony* (*Anthony, Hoddick, Reinwald & O'Connor* of counsel) for Trustee-appellees.

CONCURRING OPINION OF ABE, J.

As to the issues covered by the majority opinion, I am in complete agreement. However, I believe that this Court should also touch upon two other issues of major importance; and, therefore, I am constrained to express my opinion on these issues. These matters involve the Kahehameha Schools' practices of admitting only students having Hawaiian ancestry and hiring only teachers belonging to a particular sect of the Protestant religion.

I believe that these issues ought to be reached in this opinion. As has been indicated, a proceeding for a trust accounting "involves an adjudication upon each item of the account." *In re Estate of Bishop,* 37 Haw. 111, 124 (1945). Our role in reviewing the Circuit Court's approval or disapproval of a trust account is to determine the propriety of any expenditure or receipt in the account. In this case, the record shows that the trustees incurred many expenditures to benefit persons of Hawaiian ancestry and nothing to benefit non-Hawaiians. It shows that considerable sums were spent to.employ Protestant teachers belonging to particular sects, but nothing was spent to employ-non-Protestant teachers.

The Master himself gave considerable discussion to matters bearing on each of these issues.[1]

We need not, however, rest our decision to reach these issues on such narrow grounds. Even if these issues had not been raised, I would invoke the doctrine of plain error in order to avoid a miscarriage of justice. We are dealing with a case of public importance involving basic rights of persons under the will of Mrs. Bishop who have been represented by the Attorney General pursuant to a relation that is analogous to that of a criminal defendant and a court-appointed counsel. Those persons ought not be denied their basic rights merely because the Attorney General, perhaps the only person who has the power to contest a decision by the trustees, has for reasons of his own failed to raise such issues. In my opinion should Kamehameha Schools continue discriminatory practices subsequent to the filing of this opinion, the Attorney General would be an appropriate party to institute proceedings for proper relief.

Pertinent to the question of whether Kamehameha Schools may continue its policy of complete racial exclusion of all persons who lack Hawaiian ancestry is the following portion of Mrs. Bishop's will:

> "I give, devise and bequeath all of the rest, residue and remainder of my estate real and personal, wherever situated unto the trustees below named, their heirs and assigns forever, to hold upon the following trusts, namely: to erect and maintain in the Hawaiian Islands two schools, each for boarding and day scholars, one for boys and one for girls, to be known as, and called the Kamehameha Schools. I direct my trustees to expend such amount as they may deem best, not to exceed however one-half of the fund which may come into their hands, in the purchase of suitable premises, the erection of school buildings, and in furnishing the same with the necessary and appropriate fixtures furniture and apparatus. I direct my trustees to invest the remainder of my estate in such

---

[1]Master's Report at 92 ff. and 104.

manner as they may think best, and to expend the annual income in the maintenance of said schools; meaning thereby the salaries of teachers, the repairing buildings and other incidental expenses; and to devote a portion of each years income to the support and education of orphans, and others in indigent circumstances, giving the preference to Hawaiians of pure or part aboriginal blood . . . ."

The language of this provision is free from ambiguity. It provides simply for the erection of "two schools, each for boarding and day scholars, one for boys and one for girls . . . ." The only racial limitation is contained in the direction "to devote a portion of each years income to the support and education of orphans, and others in indigent circumstances, giving preference to Hawaiians of pure or part aboriginal blood . . . ." The language manifests an intention to establish a school open generally to all boys and girls with the qualification that some funds be used to educate orphans and indigents. In determining which orphans and indigents should receive assistance, preference to Hawaiians was to be given. As a matter of the interpretation of a will, it seems unquestionably clear that Mrs. Bishop did not intend to establish a school which would completely exclude all persons who lack Hawaiian ancestry. Indeed, the language seems so clear in its intention that it is rather startling that it was ever interpreted otherwise.

Whoever it was that made the initial misinterpretation of Mrs. Bishop's will performed a great disservice not only to those persons who have been wrongfully excluded from Mrs. Bishop's beneficence but also to the students educated at Kamehameha Schools and to Mrs. Bishop, the testatrix, as well. All races must have the capacity to live and work together, treating each other as individuals, and not as representatives of their progenitors. The fact that a student may be of Japanese, Chinese, Caucasian, Filipino, or other ancestry is not significant. The important thing is that all of the children, whether they are of different racial or ethnic background, are human beings, alive and living harmoniously

together in Hawaii. Whether or not young children learn this basic truth depends in part on the environment in which they are educated. Prejudices are not innate but acquired. No race is better than any other, and children unless placed in an artificial environment or inculcated with the prejudices of their elders, are instinctively aware of the inherent equality of all men. This Court should not sanction an accounting which reveals a departure from Mrs. Bishop's intention that has wronged the very beneficiaries of her bounty.

Even if Mrs. Bishop's will could reasonably be interpreted to provide for a practice of racial discrimination, we would be compelled to apply the doctrine of *cy pres* to reform the will. And since that doctrine must be invoked to reach the problems posed by the provisions of the will precluding the school from hiring non-Protestant teachers, an examination of the principles involved is appropriate here.

The Equal Protection Clause of the United States Constitution provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." Although read literally, the clause would apply only to actions of a State government, the United States Supreme Court has employed a more expansive interpretation, and regardless of the personal views of the members of this Court, we are bound to follow the Supreme Court's interpretation of the minimal guarantees of the Equal Protection Clause.

Courts have invoked a variety of criteria in ruling that certain sorts of private action are subject to the same restrictions as state action. Decisions have been based on the acceptance of governmental funds, *Simkins v. Moses H. Cone Memorial Hospital,* 323 F.2d 959 (4th Cir. 1963), and on governmental participation in the activity. *Pennsylvania v. Brown,* 392 F.2d 120 (3d Cir. 1968), *cert. denied,* 391 U.S. 921 (1968). A search of the record of this case might well uncover instances in which the School has accepted State or Federal funds. This role of the Justices in appointing the Estate's trustees and the Attorney General's role as parens patriae of charitable trusts might afford an alternate basis for the conclusion that acts of Kamehameha Schools are

State action. Lest there be some misunderstanding however, I prefer to base my conclusion on the public function doctrine.

The United States Supreme Court has held the acts that would ordinarily be State action do not become exempt from the Equal Protection Clause merely because a private entity actually performs the act. In *Marsh v. Alabama*, 326 U.S. 501 (1946), the Court held that acts of a company town that was completely privately owned were state action because the town was "built and operated primarily to benefit the public" and performed what "is essentially a public function." 326 U.S. at 506-507. In *Terry v. Adams*, 345 U.S. 461 (1953), the Court held that a primary election conducted by a purely private political party would be treated as a state primary. And in *Evans v. Newton*, 382 U.S. 296 (1966) the Court "buttressed" its conclusion that a private park was subject to the same constitutional limitations as a public park by pointing to "the nature of the service rendered the community by a park." There, the Court said:

> "The service rendered even by a private park of this character is municipal in nature. It is open to every white person, there being no selective element other than race . . . . A park . . . is . . . like a fire department or police department that traditionally serves the community. Mass recreation through the use of parks is plainly in the public domain . . . . [T]he predominate character and purpose of this park are municipal."

382 U.S. at 301-302.

The Supreme Court has done little to establish a precise test to define the sorts of private action which will be treated as State action. As the Court has said, "[o]nly by sifting facts and weighing circumstances can nonobvious involvement of the State in private conduct be attributed its true significance." *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961). The size of the institution is obviously of importance. A small medical clinic is likely to be treated differently from a large hospital. And institutions providing health care or education may be more likely to fall under

the terms of the Equal Protection Clause than institutions performing other functions. The fact that the institution holds itself open generally to the public is of primary importance. A country club, a college fraternity, or a church school for children of a particular congregation are likely to be treated differently from institutions which but for a "suspect" classification are open generally to the public.

These unresolved questions need not be answered in this opinion. It is already clear that "education is perhaps the most important function of state and local government." *Brown v. Board of Education*, 347 U.S. 483, 493 (1954). And it is equally clear that in virtually every meaningful respect, Kamehameha Schools is indistinguishable from any public school in the State of Hawaii. The institution is as large if not larger than the average State school. Its curriculum is substantially identical to the curriculum of any public school. Students are not required to be of any particular religious affiliation for admission, and the school is not run by any religious sect. A student may enter Kamehameha Schools, study there for several years, and graduate, and no meaningful distinction would exist between the nature of his relationship to Kamehameha Schools and the relationship of another student to a public school.

Viewed in context, the school functions as any other public school in the State. Were the actual title to Kamehameha Schools vested in the State of Hawaii, the School would not be permitted to continue its discriminatory policies. The narrow question addressed here is whether or not the bare fact that the school is privately owned by the Bishop Estate exempts it from requirements of the Equal Protection Clause. I am of the view that the details of the legal ownership of the school are less significant in Equal Protection terms than other factors involved. Like the company town in *Marsh* and the park in *Evans*, Kamehameha Schools perform a public function, and unless its classifications pass muster under the Equal Protection Clause, they must be declared unconstitutional.

Existing case law sheds little light on the question of

whether certain classifications may be rational when made by a quasi-public institution but invidious when made by the State government. Merely labeling an institution "private" or "public" may not be a sufficiently sensitive constitutional analysis. *See* E. Clark, Charitable Trusts, the Fourteenth Amendment and the Will of Stephen Girard, 66 Yale L.J. 979, 1009 ff. (1957); Developments in the Law, Academic Freedom, 81 Harv. L. Rev. 1045, 1063-1064 (1968); *Evans v. Newton,* 382 U.S. 296, 300 (1966). Obviously, a school which cannot accept every applicant must employ some method of selection. Random acceptance, while free of constitutional infirmities, might not be the wisest use of a school's funds. Giving preference solely to the applicants who score best on admission tests is likely to mean that the school accepts chiefly those students who come from advantageous backgrounds and have the least need for special assistance. It is unlikely that a school's benefactor would desire that result. Whether or not a school subject to the Equal Protection Clause would give preference to persons having a particular ancestry is uncertain.

What is certain is that Kamehameha Schools' policy of complete racial exclusion of all persons who lack Hawaiian ancestry I believe is unconstitutional. Aside from the fact that Mrs. Bishop did not intend to establish a school which would exclude all non-Hawaiians, the Schools' discriminatory practice cannot withstand the close scrutiny required of suspect classifications. Children having Hawaiian ancestry are not inherently more deserving of assistance than Samoan children, Filipino children, Micronesian children, Black children, Korean children, Portuguese children, or any other children. Assuming arguendo that a school might be established to benefit disadvantaged children of a particular ancestry, the fact that the bulk of students admitted to Kamehameha Schools are those who score best on admissions tests and tend to come from the most advantaged backgrounds (Master's Report at 92-96) vitiates any distinctions that might be made.

What I have said concerning the Schools' racially

discriminatory practices largely disposes of the issue of whether Kamehameha Schools may continue its policy of hiring only Protestant teachers.[2] The Schools' current practice is to hire only Protestant teachers belonging to a particular sect. The practice has been defended on the basis of a provision of Mrs. Bishop's will which provides:

"I also direct that the teachers of said schools shall forever be persons of the Protestant religion, but I do not intend that the choice should be restricted to persons of any particular sect of Protestants."

The Master was somewhat surprised to find that this provision was being interpreted to justify the hiring of only Protestants belonging to a particular sect. The attorneys for the Estate took the position that "the provisions of the Will are perfectly clear" and that the practice of requiring teachers to belong to a particular sect would continue. Master's Report at 104.

I am hopeful that the Estate's attorneys show greater lucidity when interpreting provisions in the complex business documents with which the Estate deals. The problems posed by the Will's religious limitations, however, cannot be resolved solely on the basis of will interpretation, for Mrs. Bishop clearly intended the Schools to hire only Protestant teachers. It is equally clear, however, that when subjected to close scrutiny required of suspect classifications, the Schools' discriminatory hiring practices I believe must be declared unconstitutional. It is surely of no relevance to the students of Kamehameha Schools, many of whom are Buddhists, Catholics, atheists, or whatever, that they be taught English, mathematics, and science only from Protestant teachers. Since the hiring limitation has no basis,

---

[2]In *Murray v. Kobayashi*, 50 Haw. 104, 431 P.2d 940 (1967), we tested Kamehameha Schools' practice of hiring only Protestant teachers against the provisions of Ch. 90A RLH 1955 (Supp. 1965). That proceeding arose when the Estate sought a Bill of Instructions on the question of whether the Act precluded religious discrimination against non-Protestant teachers. The constitutionality of the practice under the Fourteenth Amendment was not discussed.

616

rational or otherwise, it violates the Equal Protection Clause. And since it appears that the limitation is only incidental to Mrs. Bishop's charitable intent, this court may avoid dissolving the trust by application of the doctrine of *cy pres*.

Further, it should be noted that in *Green v. Connally*, 330 F. Supp. 1150, 1164 (1971), *aff'd*, 404 U.S. 997, the Court held that under the Internal Revenue Code no private school[3] which practices racial discrimination is entitled to federal tax exemption provided for charitable or educational institutions. *See also, Pitts v. Dept. of Revenue for State of Wisconsin*, 333 F. Supp. 662 (1971). Thus, it would appear to me that the Trustees in their exercise of good business judgment should direct the Schools to discontinue the policies of racial and religious discrimination. If the Trustees fail to do so, the Attorney General is duty bound to commence appropriate action to enforce compliance with the Constitution.

---

[3]The Court made it clear that this rule was applicable to all schools practicing racial discrimination and not only to all white schools which were organized to avoid desegregated public schools.