SUSAN NAKAMOTO, Plaintiff-Appellant and CHARLES
SPEAKE, Plaintiff, *v.* FRANK F. FASI, HAZEL INOUYE,
AND CITY AND COUNTY OF HONOLULU, Defendants-
Appellees

NO. 6944

CIVIL NO. 52466

NOVEMBER 6, 1981

RICHARDSON, C.J., OGATA, MENOR,
LUM AND NAKAMURA, JJ.

## OPINION OF THE COURT BY MENOR, J.

This is an appeal from the circuit court's denial of a permanent injunction which was sought by the plaintiffs to prohibit the defendants from enforcing a City policy requiring rock concert promoters at the City-owned Neal Blaisdell Center to conduct an inspection of their patrons for bottles and cans before allowing them to enter the arena. As a necessary predicate to their request for an injunction, the plaintiffs had prayed for a declaratory judgment invalidating the City-imposed inspection procedure. Plaintiff Susan Nakamoto is the only appellant in this appeal.

A rock concert promoter's rental agreement with the City requires him to hire private security guards to maintain order and provide security against unruly, disruptive and destructive patrons. In addition, the City requires the promoter to have his security guards conduct inspections of patrons for the purpose of preventing the introduction of bottles and cans into the arena.[1] These inspections were initiated at the end of 1973 as a result of the City's growing concern over crowd behavior at rock concerts, and the trial court found in justification of this policy that "[t]here has been actual evidence via testimony of employees of the Department of Auditoriums of a number of patrons being injured by bottles and cans being thrown and by broken bottles and even the use of bottles during fights at rock concerts, all of which occurred prior to the

---

[1] The conclusion of the trial court that enforcement of the City's inspection policy constituted "state action" is not disputed. *See* Wheaton v. Hagan, 435 F. Supp. 1134 (M.D. 1977). *Also see, generally,* Estate of Bishop, 53 Haw. 604, 612-614, 499 P.2d 670, 675-76 (1972) (Abe, J., concurring).

institution of the City's inspection policy." In its findings of fact, the trial court explains the search procedure:

As implemented, the City's inspection policy involves the actual physical inspections of which Plaintiff complains. The inspections occur at or near the turnstiles of the Arena. The usual object of the inspections are women's handbags and men's and women's coats and jackets, handbags and shoulderbags if such items are large enough to conceal bottles or cans. In the case of handbags, the typical inspection may occur after the handbag has been opened with the consent of its owner at the request of a private security guard. The private security guard will visually examine the contents for bottles or cans and if bottles and cans are found, the patron is asked to leave them outside the Arena to be picked up after the rock concert, if she refuses, she is denied entry and receives a total refund on her admission ticket.

This procedure was instituted, as an administrative measure, by the City's department of auditoriums. No ordinance, statute or regulation is involved. Further, these inspections are not conducted for the specific purpose of criminal investigation or prosecution.

With respect to the incident concerning plaintiff Susan Nakamoto, the trial court found:

The facts are essentially undisputed. Susan Nakamoto attempted to enter a rock concert at the Arena on March 8, 1977 and was informed by private security guards that the handbag she was carrying was subject to inspection for bottles and cans as a condition of entry. Susan Nakamoto consented to the inspection of her handbag and was subsequently allowed to enter the Arena.

At the time of this incident, there was no sign at or near the arena concerning the City's inspection policy. Subsequently, and prior to trial, a sign announcing the policy was posted outside the arena between the concourse and the arena entrance. Similar notices were printed on the back of tickets for rock concerts. The posted sign, then and now, reads:

The check for bottles and cans in bags and jackets is for your own safety. We request your cooperation. Should you decline, you may obtain a refund.

Tenant

Plaintiff Nakamoto does not dispute the right of the City to adopt rules and regulations banning bottles and cans from the arena. Nor

does she challenge the employment of security guards to enforce these rules by appropriate and approved search procecures. Rather, her complaint stems from the actual method or procedure established by the City in excluding these items, and basic to the plaintiff's contentions is her constitutional right to be free from unreasonable searches and seizures. *See* Article IV of the Amendments to the United States Constitution;[2] Article I Section 7, of the Hawaii Constitution.[3]

I.

The defendants initially argue in defense of the City's inspection policy that inasmuch as no criminal investigation or prosecution is involved, there is no "search" within the meaning of the Fourth Amendment or the Search and Seizure Clause of the Hawaii Constitution. They contend that these provisions do not apply to situations where no criminal sanctions are imposed or contemplated. We disagree. "The basic purpose . . . [of these constitutional provisions] is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Camara v. Municipal Court,* 387 U.S. 523, 528 (1967). The constitutional proscription is clear; that is, that the person and effects of an individuals are considered to be sacrosanct and may not be the object of unreasonable searches and seizures. It draws no distinction in its application between an individual suspected of criminal activity and one who is not. *Cf. Marshall v. Barlow's, Inc.,* 436 U.S. 307, 312-13 (1978) (warrant requirement applicable to OSHA inspections). Every person is enti-

---

[2] The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[3] In almost parallel language, Article I, Section 7 of the Hawaii Constitution, provides that "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted."

tled to this protection, and it would be doing violence to the basic premise underlying these provisions for us to hold that the guarantee shields the criminal suspect from warrantless and unreasonable searches and seizures but does not apply with equal force to the law-abiding individual.

## II.

The defendants, in the alternative, argue that in any event, plaintiff Nakamoto had consented to the inspection of her handbag by the security guard, and that the trial court had so found. A search based on consent is indeed an exception to the well-established rule that all searches conducted without a warrant are deemed to be unreasonable *per se. Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973). Consent in the constitutional sense, however, means more than the absence of an objection from the individual being subjected to a search. It must be shown that such consent was, in fact, freely and voluntarily given. *State v. Patterson,* 58 Haw. 462, 467, 571 P.2d 745, 748 (1977). And while there is no requirement that the person searched be first informed of his right to refuse consent to the search, the fact that he was not so advised is nevertheless a factor to be considered in evaluating the totality of the circumstances as they bear upon the question of whether such consent was freely and voluntarily given. *Id.* at 469-70 & n. 8, 571 P.2d at 749-50 & n. 8. Consent to be valid must be uncoerced and when it is clear that the search will be conducted regardless of the consent of the party searched, there can be no voluntary waiver of his right to be free from unreasonable searches and seizures. *See State v. Kaluna,* 55 Haw. 361, 373-75, 520 P.2d 51, 60-62 (1974). So that even where he is asked directly whether he objects to the search, there must be at least some intimation that his objection would be meaningful or that the search is subject to his consent. *State v. Price,* 55 Haw. 442, 444, 521 P.2d 376, 377 (1974).

When the foregoing principles are applied to the facts as they pertain to plaintiff Nakamoto, there was clearly no consent in the constitutional sense to the search of her handbag. She was stopped by a uniformed security guard at the entrance to the arena. She was told by the security officer that he had to inspect the contents of her handbag for bottles or cans before she would be allowed to enter.

She was not informed by the guard that she had the right to refuse the inspection. She simply assumed that the security guard was acting under an ordinance, statute, or regulation authorizing the inspection. So that while she was unwilling to submit to the inspection of her personal effects, she believed that she had no other alternative but to comply; that is, if she wished to exercise her right to attend the rock concert for which she had already paid the price of admission. In these circumstances, there was no valid consent to the inspection of her handbag by the security officer. She was not aware of her right to object and she reasonably believed that she had no other alternative but to submit. Consent given in the belief that one would forfeit her right to attend the concert, if she refused to be searched, is an inherent product of coercion and will not validate an otherwise improper intrusion. *Gaioni v. Folmar*, 460 F. Supp. 10 (M.D. Ala. 1978); *Wheaton v. Hagan*, 435 F. Supp. 1134 (M.D.N.C. 1977).

### III.

But even if plaintiff Nakamoto had been notified of the City's search policy and of her right to refuse to submit to the search, the critical question of whether the City may require submission to a search as a condition of entry into the Neal Blaisdell Center arena would still need to be resolved.

The City is free to adopt and enforce reasonable rules restricting the time and manner of use of its premises, for members of the public do not have the absolute and unfettered right to enter or to make use of a City-owned facility. But once having extended, through the rock concert promoter, an invitation to the public to use its arena upon paying the price of admission, it could not further condition the exercise of this privilege upon compliance with an unconstitutional requirement. The Supreme Court has held that "the right to continue the exercise of a privilege granted by the state cannot be made to depend upon the grantee's submission to a condition prescribed by the state which is hostile to the provisions of the federal Constitution." *United States v. Chicago, Milwaukee, St. Paul & Pacific Railroad*, 282 U.S. 311, 328-29 (1931). While this rule was admittedly enunciated in a different factual context, we think that its underlying premise is equally relevant in a situation where, in the

absence of compelling circumstances, a citizen is required to relinquish his constitutional right to be free from unreasonable searches and seizures, in order to be allowed to exercise a privilege for which, incidentally in this case, he has paid.

What was required of rock concert patrons here was their submission to a search of their persons or personal effects as a condition of entry into the City arena. The defendants have attempted to justify this policy on grounds of public necessity. But necessity in terms of possible harm to the public, in and of itself, will not justify the imposition of an unreasonable requirement, for the public interest must be weighed against the Fourth Amendment interest of the individual. *United States v. Martinez-Fuerte,* 428 U.S. 543, 555 (1976). So that in weighing, as we must, the potential for harm presented by the introduction into the City arena of cans and bottles, which ordinarily would pose no danger to the public when used as intended, against the right of an individual to be free from unreasonable intrusions upon his liberty and privacy, we are constrained to find that the City's search policy constitutes too great an encroachment upon a constitutionally protected area. Only where the public interest clearly outweighs the privacy interest of the individual may he be required to surrender his Fourth Amendment protection. *See United States v. Skipwith,* 482 F.2d 1272 (5th Cir. 1973) (airport search); *Downing v. Kunzig,* 454 F.2d 1230 (6th Cir. 1972) (courthouse search).

To be subjected to a search without a warrant is an intrusion of no minor significance. This is especially so when there are no articulable facts to support a conclusion that the person searched may be in possession of the prohibited item. A valid and sufficient justification for the infringement must be shown to exist, and here there has been no showing that the threat to the public safety at rock concerts has been so pervasive and of such magnitude as to justify the extraordinary imposition which the City's search policy entails. Moreover, constitutional safeguards were designed to protect the individual from arbitrary, oppressive, and harassing conduct on the part of government officials. *United States v. Ortiz,* 422 U.S. 891, 895 (1975). And in this case too much was left to the discretion of the security guards as to which individuals were to be required to submit to the inspection. As pointed out by the trial court, "[t]he usual object of the inspections are women's handbags and men's and women's coats and

jackets, handbags and shoulderbags if such items are large enough to conceal bottles or cans." These personal clothing and effects come in all styles and measurements. They may be worn or carried. Similarly, cans and bottles are not always of the same size and configuration. So that absent clear guidelines, a search policy implemented at a point where large numbers of patrons are pressing to gain entry into the arena must necessarily result in selective enforcement and the unequal treatment of individuals. *See Gaioni v. Folmar, supra; Stroeber v. Commission Veteran's Auditorium*, 453 F. Supp. 926, 933 (S.D. Iowa 1977); *Wheaton v. Hagan, supra; Collier v. Miller*, 414 F. Supp. 1357, 1363, 1367 (S.D. Tex. 1976). Thus, aside from the inadequacy of its asserted justification, the search procedure in this case was fatally flawed by the great potential for arbitrary and random enforcement of the City's policy by the security guards. *Id.*

It is not every warrantless and nonconsensual search, of course, that is constitutionally proscribed. In a few specifically established and well-delineated exceptions, searches without a warrant have been upheld. *Schneckloth v. Bustamonte, supra.* A search based on a valid consent, as we have already pointed out, is one of those exceptions. *Id.* And in recent years, warrantless searches at courthouses and airports have also received judicial recognition and approval. *United States v. Skipwith, supra; Downing v. Kunzig, supra.*

Airport and courtroom searches have received judicial sanction essentially because of the magnitude and pervasiveness of the danger to the public safety. The overriding concern in these areas has been the threat of death or serious bodily injury to members of the public posed by the introduction of inherently lethal weapons or bombs. Constitutional provisions, obviously, were never intended to restrict government from adopting reasonable measures to protect its citizenry. But the courts have always been careful to point out that the interference to which an individual's liberty and privacy are exposed must be limited to the very minimum necessary to accomplish the governmental objective. Thus, in *Downing*, where direct and immediate threat of violence and property destruction was found to justify the government's search policy, it was emphasized that the only interference with access to the courthouse was a brief stop and a cursory examination of packages or briefcases to determine the possible existence of articles having a potential for death or destruction. And in the airport context, the usual method of inspec-

tion has been the utilization of magnetometers, a procedure which minimizes citizen inconvenience, resentment, and embarrassment and which appears to have had much success in preventing the passage of prohibited weapons. *United States v. Skipwith, supra,* 482 F.2d at 1275-76.

The degree to which a citizen may be required to relinquish a constitutional right, in the interests of public safety, must be commensurate with the extent and nature of the threatened harm upon which the government relies to justify the infringement. *United States v. Skipwith, supra.* The defendants' relience, by analogy, upon judicial approval of airport and courtroom searches is, therefore, misplaced. Certainly, it cannot be seriously argued that the threat to the public safety in the present case is as grave as those which justified suspending the warrant requirement in airport and courthouse searches. For as the court in *Collier v. Miller, supra,* in a substantially similar factual context, has pointed out:

> The courts have relaxed the strictures of the Fourth Amendment in light of the unprecedented violence experienced in these two public areas. In the present case the nature of the threat is injury posed by a can or bottle which might be thrown with resulting injuries. But unlike a bomb or other weapon considered in the courtroom or airport cases, cans and bottles have many proper uses, and it is only through their misuse that injury can result. The defendants' objective in seeking to prevent this misuse is unquestionably a valid one. But it is also quite clear that the dangers posed by the potential use of bottles and cans as projectiles pales in comparison to the dangers posed by a bomb or a gun used to facilitate a skyjacking or terrorize a courtroom. [414 F. Supp. at 1362.]

We think it would have been reasonable for the security guard to briefly stop a patron carrying a handbag or other personal article capable of concealing a can or bottle, and then to ask the person stopped whether he was carrying a bottle or a can and to remind him that neither item was allowed into the arena. Upon receiving a negative answer and if still not satisfied with the response, the guard, after first making it clear to the person stopped that he need not accede to the request, might then have asked the patron if he would agree to open the suspected container for inspection. If the patron refused, and the guard was without a clear and articulable basis for

concluding that the person stopped was carrying the prohibited item, the guard could not then have detained him any longer or refused him entry into the arena.[4]

The City is entitled to take necessary steps to prevent the misuse of its premises, and to provide protection for those whom it invites to its facilities. It may not, however, impose conditions for their use which are so unreasonable as to be violative of constitutional provisions. The City in this case was within its rights to prohibit the introduction of bottles and cans into the Neal Blaisdell Center arena. But to require a rock concert patron to submit to a search for no other reason than that the patron was wearing clothing or carrying an article that might possibly conceal a bottle or can was, we think, clearly unreasonable.

Reversed and remanded for further proceedings consistent with this opinion.[5]

*Evan R. Shirley* for plaintiff-appellant,

*Wesley F. Fong*, Deputy Corporation Counsel for defendants-appellees.

---

[4] Another court has also suggested the banning of all parcels, bundles and pocketbooks over a certain size, with appropriate notices to that effect placed on tickets and signs, and establishing check rooms for such objects as possible alternatives. Wheaton v. Hagan, *supra*, at 1148.

[5] Whether the imposed inspection procedure might also have run afoul of the Hawaii Administrative Procedure Act, HRS Chapter 91 (1976), was raised in conference. We are, however, unable to make that determination inasmuch as the issue was not raised by the parties and the record is not clear in that regard.