34 P.3d 7

**STATE of Hawai'i, Plaintiff–Appellant,**

v.

**William HANSON, Defendant–Appellee.**

**No. 22847.**

Intermediate Court of Appeals of Hawai'i.

May 14, 2001.

Certiorari Granted June 18, 2001.

---

Caroline M. Mee, Deputy Prosecuting Attorney, City and County of Honolulu, for plaintiff-appellant.

Hayden Aluli, Honolulu, for defendant-appellee.

BURNS, C.J., LIM and FOLEY, JJ.

Opinion of the Court by FOLEY, J.

Plaintiff–Appellant State of Hawai'i (State) appeals from the August 26, 1999, "Findings of Fact, Conclusions of Law and Order Granting Defendant Hanson's Motion to Suppress Evidence, Filed July 9, 1999." The evidence suppressed by the District Court of the First Circuit (district court) order was a firearm taken from Defendant–Appellee William Hanson's (Hanson) toolbox by a security officer at the Honolulu International Airport. Hanson was subsequently charged with Failing to Register a Firearm in violation of Hawaii Revised Statutes (HRS) §§ 134–3(a) (1993)[1] and 134–17(b) (Supp.2000).[2] We vacate the district court's August 26, 1999, "Findings of Fact, Conclusions of Law and Order Granting Defendant Hanson's Motion to Suppress Evidence, Filed July 9, 1999" and remand for further proceedings consistent with this opinion.

## I.

In its order granting Hanson's Motion to Suppress Evidence, the district court made the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. At about 7:00 a.m. on June 11, 1999, at around the middle of the Honolulu International Airport Hawaiian Airlines tick-

---

1. HRS § 134–3(a) states as follows:

§ 134–3 **Registration, mandatory, exceptions.** (a) Every person arriving in the State who brings or by any other manner causes to be brought into the State a firearm of any description, whether usable or unusable, serviceable or unserviceable, modern or antique, shall register the firearm within three days after arrival of the person or of the firearm, whichever arrives later, with the chief of police of the county of the person's place of business or, if there is no place of business,

such person's residence or, if there is neither a place of business nor residence, the person's place of sojourn; provided that no alien shall be allowed to bring a firearm of any description into the State.

2. HRS § 134–17(b) states as follows:

§ 134–17 **Penalties.**
. . . .
(b) Any person who violates section 134–3(a) shall be guilty of a petty misdemeanor.

et counter, Honolulu Airport security officer Frederick Garringer asked Defendant HANSON to open his large wooden tool box.

2. HANSON, who was scheduled to depart Honolulu on a Hawaiian Airlines flight to Kailua–Kona, had checked in numerous luggage and personal property, along with his wooden tool box, at the Hawaiian Airlines counter.

3. Garringer, who was operating an x-ray screening device, wanted to look into HANSON's tool box because the x-ray machine could not identify all of the items within the tool box.

4. HANSON orally consented to the search of his tool box and opened the combination lock of the tool box.

5. While looking through HANSON's tool box, which contained various carpenter tools, Garringer came across a tan plastic bag wrapped in black duct tape.

6. Garringer wanted to search the contents of the plastic bag and could have, pursuant to  ' ᵈlard operation procedures, re-scanned the plastic bag through the x-ray machine.

7. Instead of re-scanning the plastic bag, Garringer testified at the suppression hearing that he asked HANSON for permission to search the plastic bag.

8. HANSON also testified at the suppression hearing. HANSON testified that Garringer did not ask him for his permission to search the plastic bag. Instead, Garringer proceeded to open the plastic bag without first obtaining HANSON's consent.

9. HANSON is more credible than Garringer with respect to whether Garringer had asked HANSON for permission to search the plastic bag.

10. Under the totality of circumstances in this case, HANSON did not freely and voluntarily consent to the search of the plastic bag found within his tool box.

11. Under the totality of circumstances in this case, HANSON did not voluntarily waive his right to be free from unreasonable searches and seizures.

12. After Garringer opened the plastic bag, he saw a ziplock bag containing a white cardboard box. Garringer opened this box and saw a black handgun in a leather holster.

### CONCLUSIONS OF LAW

1. It is well-settled that a warrantless search of items or premises in which a defendant has a legitimate expectation of privacy is presumptively unreasonable. *State v. Russo*, 67 Haw. 126, 681 P.2d 553 (1984) (searches outside of judicial process without prior court approval are per se unreasonable, subject only to a few specifically established exceptions).

2. The government must overcome this presumption by proving that the search falls within one of the well-delineated exceptions to the warrant requirement. *State v. Reed*, 70 Haw. 107, 762 P.2d 803 (1988); *State v. Ritte*, 68 Haw. 253, 710 P.2d 1197 (1985).

3. "A search conducted pursuant to voluntary and uncoerced consent by the person being searched is one of the exceptions to the warrant requirement." *State v. Mahone*, 67 Haw. 644, 646, 701 P.2d 171, 173 (1985). "Such an exception is applicable only if the right to be free from unreasonable searches and seizures is waived by the individual entitled to the right." *Id.* at 646–47, 701 P.2d at 173.

4. Under the totality of circumstances in this case, HANSON consented to the search of his tool box by unlocking the combination lock.

5. However, under the totality of circumstances in this case, HANSON did not freely and voluntarily consent to the search of the plastic bag found within his tool box.

6. Under the totality of circumstances in this case, HANSON did not voluntarily waive his right to be free from unreasonable searches and seizures.

### II.

"We review a ruling on a motion to suppress *de novo* in order to determine whether it was right or wrong as a matter of law."

*State v. Ramos,* 93 Hawai'i 502, 507, 6 P.3d 374, 379 (App.2000).

■ "The determination of whether a search was lawfully conducted is entirely a question of law, which this court reviews *de novo* under the right/wrong standard." *State v. Wallace,* 80 Hawai'i 382, 391, 910 P.2d 695, 704 (1996) (internal quotation marks omitted).

■ "[T]he findings of a trier of fact regarding the validity of consent to search must be upheld unless 'clearly erroneous.'" *State v. Patterson,* 58 Haw. 462, 469, 571 P.2d 745, 749 (1977).

### III.

■ The search of Hanson's wooden toolbox was conducted by Garringer, who the district court found to be a "Honolulu Airport security officer." Garringer testified he was employed by International Total Service (ITS), "a preboard screening security outfit." Garringer did not know whether ITS had "a contract with the airport or individual airlines." Garringer testified that ITS trained him to conduct x-ray screening pursuant to Federal Aviation Administration (FAA) regulations and directives. Garringer testified that these FAA regulations directed him to look for "hand grenades, pipe bombs, dynamite, opaques, ... [and] handguns" when doing his "x-ray screening."

Hanson's Motion to Suppress Evidence asserted that Garringer's search and seizure of Hanson's firearm "was obtained as a result of a warrantless, nonconsensual search and seizure of HANSON's personal property in violation of Article I, §§ 5 [3] & 7 [4] of the Hawai'i

3. Article I, § 5 of the Hawai'i Constitution provides:

No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of the person's civil rights or be discriminated against in the exercise thereof because of race, religion, sex or ancestry.

4. Article I, § 7 of the Hawai'i Constitution provides:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants

State Constitution, as well as the Fourth Amendment [5] to the United States Constitution."

The district court did not expressly decide that the search of Hanson's toolbox was a "governmental search." Such a decision was necessary to invoke article I, § 7 of the Hawai'i Constitution, and the fourth amendment to the United States Constitution (which prohibit unreasonable searches and seizures). *State v. Boynton,* 58 Haw. 530, 536, 574 P.2d 1330, 1334 (1978). We must determine whether the search of Hanson's toolbox by Garringer, a private individual, was conducted "at [the] government's initiation and under their guidance" to make the search a governmental search. *Id.* at 536, 574 P.2d at 1334.

Garringer testified that his search of Hanson's toolbox was done pursuant to FAA regulations. The Ninth Circuit Court of Appeals has concluded that airport searches of passengers' baggage by private individuals pursuant to FAA regulations are "within the reach of the Fourth Amendment" because of the significant participation of the government in the "development and implementation of the airport search program." *United States v. Davis,* 482 F.2d 893, 904 (9th Cir. 1973); *see also United States v. Henry,* 615 F.2d 1223, 1228 (9th Cir.1980).

The search of Hanson's toolbox by Garringer appears to have been pursuant to a screening system adopted by Hawaiian Airlines as mandated by FAA regulation 14 C.F.R. § 108.9 (1991), which provides:

**§ 108.9 Screening of passengers and property.**

shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

5. The fourth amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

(a) Each certificate holder required to conduct screening under a security program shall use the procedures included, and the facilities and equipment described, in its approved security program to prevent or deter the carriage aboard airplanes of any explosive, incendiary, or a deadly or dangerous weapon on or about each individual's person or accessible property, and the carriage of any explosive or incendiary in checked baggage.

(b) Each certificate holder required to conduct screening under a security program shall refuse to transport—

(1) Any person who does not consent to a search of his or her person in accordance with the screening system prescribed in paragraph (a) of this section; and

(2) Any property of any person who does not consent to a search or inspection of that property in accordance with the screening system prescribed by paragraph (a) of this section.

(c) Except as provided by its approved security program, each certificate holder required to conduct screening under a security program shall use the procedures included, and the facilities and equipment described, in its approved security program for detecting explosives, incendiaries, and deadly or dangerous weapons to inspect each person entering a sterile area at each preboarding screening checkpoint in the United States for which it is responsible, and to inspect all accessible property under that person's control.

(d) Each certificate holder shall staff its security screening checkpoints with supervisory and non-supervisory personnel in accordance with the standards specified in its security program.

State law makes the state Department of Transportation (DOT) responsible for the operation of the Honolulu International Airport, as well as other airports in the state that are not owned or operated by the United States. HRS Chapter 261 (Aeronautics). DOT is required to "cooperate with and assist the federal government ... in the development of aeronautics [6] and shall seek to coordinate the aeronautical activities of the State with those of the federal government." HRS § 261–2 (1993) (footnote added). The director of DOT is empowered to adopt rules, and has done so,[7] relating to "[a]irport security measures or requirements, and designation of sterile passenger holding areas and operational areas" and "[a]ny other matter relating to the health, safety and welfare of the general public and persons operating, using, or traveling in aircraft." HRS § 261–12(a)(4) & (6) (1993). Rules promulgated by the director of DOT must conform with federal law and regulations governing the operation of airports. HRS § 261–12(d) (1993). DOT is responsible for the enforcement of state laws and rules that govern the operation of the airport and may contract with persons to act on DOT's behalf. HRS § 261–17 (Supp.2000).[8] FAA regulations require DOT, as an airport operator, to provide law enforcement support for the FAA mandated security and screening systems, which were used by Hawaiian Airlines in this case. 14 C.F.R. § 107.15 (1981).

The federal and state statutory and regulatory schemes, which establish security and screening procedures at airports governed by both FAA and DOT, make Garringer's search of Hanson's toolbox a governmental search for purposes of article I, § 7 of the Hawai'i Constitution, as well as the fourth amendment.

### IV.

In granting Hanson's Motion to Suppress Evidence, the district court did not indicate

6. HRS § 261–1 (Supp.2000) defines "aeronautics" as follows:

"Aeronautics" means the science and art of flight, including but not limited to transportation by aircraft; the operation, construction, repair, or maintenance of aircraft, aircraft power plants and accessories, including the repair, packing, and maintenance of parachutes; the design, establishment, construction, extension, operation, improvement, repair, or maintenance of airports, or other air navigation facilities; and instruction in flying or ground subjects pertaining thereto.

7. Hawai'i Administrative Rules, Title 19.

8. It is unclear in the record whether ITS (Garringer's employer) contracted with DOT or with Hawaiian Airlines. 14 C.F.R. § 108.9(d) suggests ITS contracted with Hawaiian Airlines.

whether it concluded that Garringer's search of Hanson's toolbox was unreasonable under both the federal and state constitutions, or only the Hawai'i Constitution. The Hawai'i Supreme Court has concluded that a person's expectation of privacy under article I, § 7 of the Hawai'i Constitution is greater than that under the fourth amendment to the United States Constitution. *State v. Tanaka,* 67 Haw. 658, 661–62, 701 P.2d 1274, 1276 (1985).

We therefore first consider whether Garringer's search violated Hanson's reasonable expectation of privacy under the fourth amendment. If there were such a violation, the violation would also be of article I, § 7 of the Hawai'i Constitution.

The Ninth Circuit Court of Appeals has held:

> [T]hose passengers placing luggage on an x-ray machine's conveyor belt for airplane travel at a secured boarding area impliedly consent to a visual inspection and limited hand search of their luggage if the x-ray scan is inconclusive in determining whether the luggage contains weapons or other dangerous objects.

*United States v. Pulido–Baquerizo,* 800 F.2d 899, 901 (9th Cir.1986). The rationale for this holding is that:

> Under the fourth amendment, only unreasonable searches and seizures are prohibited. The determination of reasonableness requires a balancing of an individual's right to be free of intrusive searches with society's interest in safe air travel. "What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya De Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381, 388 (1985).
>
> The governmental interest in detecting the weapons employed in airline terrorism is great. Airplane skyjacking and bombings at airports have proliferated since our decision in *Davis.*[9] Additionally, firearms and explosives can be small and easily concealed. Their detection is difficult if limited to an inconclusive x-ray scan. The scan and subsequent search involves only a

slight privacy intrusion as long as the scope of the search is limited to the detection of weapons, explosives, or any other dangerous devices, and is conducted in a manner which produces negligible social stigma. Given these circumstances, a visual inspection and limited hand search of luggage which is used for the purpose of detecting weapons or explosives, and not in order to uncover other types of contraband, is a privacy intrusion we believe free society is willing to tolerate.

*United States v. Pulido–Baquerizo,* 800 F.2d at 901–02 (footnote added).

The approach of the Ninth Circuit is consistent with decisions in other circuits. *See United States v. Herzbrun,* 723 F.2d 773, 776 (11th Cir.1984) (automatic consent to a hand search); *United States v. Wehrli,* 637 F.2d 408, 409–10 (5th Cir.), *cert. denied,* 452 U.S. 942, 101 S.Ct. 3089, 69 L.Ed.2d 958 (1981) (implied consent where x-ray inconclusive); *United States v. DeAngelo,* 584 F.2d 46, 47–48 (4th Cir.1978), *cert. denied,* 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 493 (1979) (implied consent); *United States v. Williams,* 516 F.2d 11, 12 (2d Cir.1975) (per curiam) (implied consent).

In applying the fourth amendment to and upholding a luggage search similar to the case at hand, the Colorado Supreme Court stated:

> Airport security screening procedures for potential passengers have consistently been upheld as a form of consensual regulatory search in furtherance of a systematic program directed at ensuring the safety of persons and property traveling in air commerce. *E.g., United States v. $124,570 U.S. Currency,* 873 F.2d 1240, 1242–43 (9th Cir.1989); *United States v. Lopez–Pages,* 767 F.2d 776, 778 (11th Cir.1985); *United States v. Gorman,* 637 F.2d 352, 353 (5th Cir.1981); *United States v. Cyzewski,* 484 F.2d 509, 513 (5th Cir.1973), *cert. denied,* 415 U.S. 902, 94 S.Ct. 936, 39 L.Ed.2d 459 (1974); *Davis,* 482 F.2d at 908–12. The rationale for this type of search was succinctly stated as follows:
>
> > When the risk is the jeopardy to hundreds of human lives and millions of

9. *United States v. Davis,* 482 F.2d 893 (9th Cir. 1973).

dollars of property inherent in the pirating or blowing up of a large airplane, the danger *alone* meets the test of reasonableness, so long as the search is conducted in good faith for the purpose of preventing hijacking or like damage and with reasonable scope and the passenger has been given advance notice of his liability to such a search so that he can avoid it by choosing not to travel by air. *United States v. Bell,* 464 F.2d 667, 675 (2d Cir.), *cert. denied,* 409 U.S. 991, 93 S.Ct. 335, 34 L.Ed.2d 258 (1972) (Friendly, J., concurring) (footnote omitted and emphasis in original). An airport security search to which a potential passenger voluntarily consents by submitting himself to the screening process, therefore, need not be justified by any showing of probable cause or reasonable suspicion.

*People v. Heimel,* 812 P.2d 1177, 1181 (Colo. 1991).

■ We see no reason to apply the fourth amendment to the case at hand any differently than the Ninth Circuit Court of Appeals did in *Pulido–Baquerizo* or the Colorado Supreme Court did in *Heimel.* Hanson was a frequent flyer familiar with airport security and screening procedures mandated by FAA regulations. Because he did not want to miss his flight to Kailua–Kona, he consented to the x-ray screening and manual search of his toolbox. By consenting to this process, Hanson implicitly consented to a hand search of an item in a tan plastic bag where the x-ray scan was inconclusive so the airport security officer could determine whether this item was a weapon, explosive, or other dangerous item.[10]

Although Hanson did not attempt to stop the manual search of items in his toolbox, the Ninth Circuit has held it would have been too late for him to do so:

The requirement in *Davis* of allowing passengers to avoid the search by electing not to fly does not extend to a passenger who has already submitted his luggage for an x-ray scan. *Davis* requires notice, not actual knowledge, of the need to submit

luggage for inspection. . . . A rule allowing a passenger to leave without a search after an inconclusive x-ray scan would encourage airline terrorism by providing a secure exit where detection was threatened. Also, an airport screening agent has a duty to ferret out firearms and explosive devices carried by passengers. This duty could not be fulfilled if the agent was prohibited from conducting a visual inspection and limited hand search after an inconclusive x-ray scan. Thus, if a potential passenger chooses to avoid a search, he must elect not to fly before placing his baggage on the x-ray machine's conveyor belt.

*Pulido–Baquerizo,* 800 F.2d at 902 (citations omitted).

## V.

The Hawai'i Supreme Court has indicated that a warrantless and nonconsensual search at an airport may be appropriate under certain circumstances:

It is not every warrantless and nonconsensual search, of course, that is constitutionally proscribed. In a few specifically established and well-delineated exceptions, searches without a warrant have been upheld. . . . And in recent years, warrantless searches at courthouses and airports have also received judicial recognition and approval. *United States v. Skipwith*[, 482 F.2d 1272 (5th Cir.1973) ]; *Downing v. Kunzig*[, 454 F.2d 1230 (6th Cir.1972) ].

Airport and courtroom searches have received judicial sanction essentially because of the magnitude and pervasiveness of the danger to the public safety. The overriding concern in these areas has been the threat of death or serious bodily injury to members of the public posed by the introduction of inherently lethal weapons or bombs. Constitutional provisions, obviously, were never intended to restrict government from adopting reasonable measures to protect its citizenry. But the courts have always been careful to point out that

---

**10.** When Hanson was asked by Garringer what was in the tan plastic bag, Hanson replied he did not know.

the interference to which an individual's liberty and privacy are exposed must be limited to the very minimum necessary to accomplish the governmental objective. Thus, in *Downing*, where direct and immediate threat of violence and property destruction was found to justify the government's search policy, it was emphasized that the only interference with access to the courthouse was a brief stop and a cursory examination of packages or briefcases to determine the possible existence of articles having a potential for death or destruction. And in the airport context, the usual method of inspection has been the utilization of magnetometers, a procedure which minimizes citizen inconvenience, resentment, and embarrassment and which appears to have had much success in preventing the passage of prohibited weapons. *United States v. Skipwith, supra,* 482 F.2d at 1275–76.

*Nakamoto v. Fasi,* 64 Haw. 17, 24–25, 635 P.2d 946, 952–53 (1981) (citation omitted).

Although the Hawai'i Supreme Court has yet to address the issue of luggage searches of boarding passengers at Hawai'i's airports, the case of *United States v. Skipwith,* 482 F.2d 1272 (5th Cir.1973), cited with approval by the court in *Nakamoto v. Fasi, supra,* gives us guidance. In *Skipwith,* the Fifth Circuit Court of Appeals upheld a warrantless search of a boarding passenger without the express consent of the passenger. The Fifth Circuit stated that the passenger "came to the specific part of the airport where he knew or should have known all citizens were subject to being searched." *Skipwith,* 482 F.2d at 1274. In approving the search, the Fifth Circuit wrote:

The government contends that, in light of the magnitude of the perils created by air piracy, searches of boarding passengers are controlled by the same standard applied to customs searches at the national border—mere or unsupported suspicion. Bitter experience has taught us that the physical dangers of mass kidnapping and extortion posed by air piracy are even greater than the dangers against which the usual border search is directed. Necessity alone, however, whether produced by danger or otherwise, does not in itself make all non-probable-cause searches reasonable. Reasonableness requires that the courts must weigh more than the necessity of the search in terms of possible harm to the public. The equation must also take into account the likelihood that the search procedure will be effective in averting the potential harm. On the opposite balance we must evaluate the degree and nature of intrusion into the privacy of the person and effects of the citizen which the search entails.

In undertaking our calculation of the weight to be accorded to these three factors in the case at bar—public necessity, efficacy of the search, and degree of intrusion—we need not reiterate what was said in [*U.S. v.*] *Moreno* [475 F.2d 44 (5th Cir. 1973)] about the dangers posed by air piracy; suffice it to say that there is a judicially-recognized necessity to insure that the potential harms of air piracy are foiled. The search procedures have every indicia of being the most efficacious that could be used. The group being screened is limited to persons with the immediate intention of boarding aircraft. Metal detectors, visual inspection, and rare but potential physical searches appear to this court to provide as much efficiency to the process as it could have.

On the other side of the judicial scales, the intrusion which the airport search imposes on the public is not insubstantial. It is inconvenient and annoying, in some cases it may be embarrassing, and at times it can be incriminating. There are several factors, however, which make this search less offensive to the searched person than similar searches in other contexts. One such factor is the almost complete absence of any stigma attached to being subjected to search at a known, designated airport search point. As one commentator has put it in the border search context, "individuals searched because of their membership in a morally neutral class have less cause to feel insulted...." In addition, the offensiveness of the screening process is somewhat mitigated by the fact that the person to be searched must voluntarily come to and enter the search area. He has every opportunity to avoid the procedure by not

entering the boarding area. Finally, the circumstances under which the airport search is conducted make it much less likely that abuses will occur. Unlike searches conducted on dark and lonely streets at night where often the officer and the subject are the only witnesses, these searches are made under supervision and not far from the scrutiny of the traveling public. Moreover, the airlines, which have their representatives present, have a definite and substantial interest in assuring that their passengers are not unnecessarily harassed. The officers conducting the search under these circumstances are much more likely to be solicitous of the Fourth Amendment rights of the traveling public than in more isolated, unsupervised surroundings.

Our conclusion, after this tripartite weighing of the relevant factors, is that the standards for initiating a search of a person at the boarding gate should be no more stringent than those applied in border crossing situations. In the critical preboarding area where this search started, reasonableness does not require that officers search only those passengers who meet a profile or who manifest signs of nervousness or who otherwise appear suspicious. Such a requirement would have to assume that hijackers are readily identifiable or that they invariably possess certain traits. The number of lives placed at hazard by this criminal paranoia forbid taking such deadly chances. As Judge Friendly has stated:

> Determination of what is reasonable requires a weighing of the harm against the need. When the object of the search is simply the detection of past crime, probable cause to arrest is generally the appropriate test.... When the risk is the jeopardy to hundreds of human lives and millions of dollars of property inherent in the pirating or blowing up of a large airplane, the danger *alone* meets the test of reasonableness, so long as the search is conducted in good faith for the purpose of preventing hijacking or like damage and with reasonable scope and the passenger has been given advance notice of his liability to such a search so

that he can avoid it by choosing not to travel by air.

> *United States v. Bell,* 464 F.2d 667, 675 (2d Cir.1972) (concurring) (footnote omitted) [emphasis in original].

*Skipwith,* 482 F.2d at 1275–76 (footnotes omitted; ellipses in original).

■ We believe the logic of the Fifth Circuit is sound. We do not find the cases cited by the district court or Hanson to dictate a contrary reading of the fourth amendment or article I, § 7 of the Hawai'i Constitution as applied to warrantless, nonconsensual searches of boarding passengers' luggage at Hawai'i's airports.

The district court in its conclusions of law cites *State v. Russo,* 67 Haw. 126, 681 P.2d 553 (1984); *State v. Reed,* 70 Haw. 107, 762 P.2d 803 (1988); *State v. Ritte,* 68 Haw. 253, 710 P.2d 1197 (1985); and *State v. Mahone,* 67 Haw. 644, 701 P.2d 171 (1985), as authority for its holding in this case. None of these cases address the issues involved in an airport search. *Russo* involved the search of a trunk of a car. *Reed* concerned a pat-down search of an arrestee. The Hawai'i Supreme Court in *Reed* held a "warrantless, limited pat-down search after a valid arrest · for weapons, escape instrumentalities, or contraband as reasonable and necessary for the arresting police officer's safety." 70 Haw. at 114, 762 P.2d at 807. In *Ritte,* the Hawai'i Supreme Court rejected the warrantless search of a pickup truck where the defendants were in custody and there would have been no danger to the public if the police officers had delayed the search by obtaining a search warrant. *Mahone* dealt with a consensual search of an apartment; the search was upheld.

The district court orally cited cases in granting Hanson's Motion to Suppress Evidence that were not cited in its conclusions of law. These cases were *Nakamoto v. Fasi, supra; State v. Kearns,* 75 Haw. 558, 867 P.2d 903 (1994); and *State v. Wiley,* 69 Haw. 589, 752 P.2d 102 (1988). As previously stated, we believe the language of *Nakamoto,* and its reliance on *Skipwith* for airport searches, supports the search of Hanson's toolbox and does not support the district

court's ruling. *Kearns* and *Wiley* were airport searches, but searches quite different than the one at hand.

In *Kearns,* the search was of a person leaving the airport at the exit area after that person had already been "seized" for purposes of article I, § 7 of the Hawai'i Constitution. There was no public safety issue raised in *Kearns. Wiley* concerned a search of luggage after an arrest. The Hawai'i Supreme Court concluded the search to be unreasonable "[b]ecause Defendant was already under arrest and his belongings safely immobilized under the control of law enforcement officers." 69 Haw. at 591, 752 P.2d at 103. The court stated:

> [W]hen no exigency is shown to support the need for an immediate search, the Warrant Clause places the line at the point where the property to be searched comes under the exclusive dominion of police authority. Therefore, the warrantless search of the pillow became unreasonable once it was placed under the complete control of the law enforcement officers.

69 Haw. at 591, 752 P.2d at 104 (internal quotation marks and citation omitted). Unlike Wiley, Hanson was not arrested prior to the search of his toolbox, and his toolbox was not under the control of law enforcement officers at the time of the search.

## VI.

We find no authority in the oral or written conclusions of the district court that supports its order granting Hanson's Motion to Suppress Evidence. We conclude that the search of Hanson's toolbox was reasonable under the fourth amendment to the United States Constitution and article I, § 7 of the Hawai'i Constitution. Therefore, the district court's August 26, 1999, "Findings of Fact, Conclusions of Law and Order Granting Defendant Hanson's Motion to Suppress Evidence, Filed July 9, 1999" is vacated, and this case is remanded to the district court for further proceedings consistent with this opinion.