The PEOPLE of the State of Colorado, Plaintiff–Appellant,

v.

Bryan HEIMEL, Defendant–Appellee.

No. 91SA11.

Supreme Court of Colorado, En Banc.

July 9, 1991.

John Suthers, Dist. Atty., Robert D. Jones, Deputy Dist. Atty., Colorado Springs, for plaintiff-appellant.

David F. Vela, State Public Defender, Theresa M. Cisneros, Deputy State Public Defender, Colorado Springs, for defendant-appellee.

Justice QUINN delivered the Opinion of the Court.

In this interlocutory appeal, the People challenge a district court ruling which suppressed illegal drugs seized from the defendant, Bryan Heimel, during a warrantless search of a small bag at a municipal airport after the defendant presented himself at a checkpoint station for security screening, submitted to the screening process, and then refused permission to search his bag and withdrew from the checkpoint station. The court ruled that there was not probable cause for the search of the contents of the bag and that, consequently, the officer who stopped and detained the defendant was entitled to do no more than feel the outside of the bag for a weapon in order to ensure the officer's safety during the temporary detention. We conclude that the warrantless search under the circumstances present here was pursuant to a legitimate regulatory program designed to secure the safety of persons and property in air commerce and did not violate either the federal or state constitutional proscription against an unlawful search or seizure. We accordingly reverse the suppression ruling and remand the case to the district court for further proceedings.

## I.

The defendant is charged in the District Court of El Paso County with unlawful possession of psilocybin, a schedule I controlled substance,[1] and unlawful possession of psilocybin with intent to sell or distribute.[2] The charges are based on the seizure of illegal drugs from the defendant during an airport security search at the Colorado Springs Municipal Airport on August 3, 1990.

There is no dispute regarding the basic facts underlying the suppression ruling. Airport security screening procedures have their source in the Air Transportation Security Act of 1974, Pub.L.No. 93-366, 88 Stat. 415 (codified at 49 U.S.C.App. §§ 1301, 1356, 1357, 1472, 1511, 1515 (1989)), and are designed to prevent air piracy and other acts of criminal violence that pose a threat to the lives of persons traveling by means of air transportation. The statute requires the Administrator of the Federal Aviation Agency to prescribe "reasonable regulations requiring that all passengers and all property intended to be carried in the aircraft cabin in air transportation[3] or intrastate air transportation[4] be

1. § 12-22-309(2)(a), 5 C.R.S. (1985), and § 18-18-105, 8B C.R.S. (1986 & 1990 Supp.).

2. § 12-22-309(2)(a), 5 C.R.S. (1985), and § 18-18-105, 8B C.R.S. (1986 & 1990 Supp.).

3. Air transportation means "interstate, overseas, or foreign air transportation or the transportation of mail by aircraft." 49 U.S.C.App. § 1301(10) (1989).

4. Intrastate air transportation means "the carriage of persons or property as a common carrier for compensation or hire, by turbojet-powered aircraft capable of carrying thirty or more persons, wholly within the same State of the United States." 49 U.S.C.App. § 1301(26) (1989).

screened by weapon-detecting procedures or facilities employed or operated by employees or agents of the air carrier, intrastate air carrier, or foreign air carrier prior to boarding the aircraft for such transportation." 49 U.S.C.App. § 1356(a) (1989). The federal statute also charges the Administrator with the duty of requiring, by regulation, any air carrier, intrastate air carrier, or foreign air carrier to refuse to transport any person who does not consent to a search of his person or property for the purpose of determining whether the person is carrying or the property contains a "dangerous weapon, explosive, or other destructive substance." 49 U.S.C.App. § 1511(a)(1) and (2) (1989).

The federal regulations adopted pursuant to the Air Transportation Security Act of 1974 require all airport operators to institute and maintain an approved security program and to prohibit any person from entering a "sterile" area—that is, "an area to which access is controlled by the inspection of persons and property in accordance with an approved security program," 14 C.F.R. § 107.1(b)(5) (1991)—without submitting to the screening of his or her person and property. *See generally* 14 C.F.R. Parts 107, 108, & 129 (1991). In addition, each airport operator is required to provide "law enforcement officers in the number and in a manner adequate to support ... [i]ts security program ... and ... [e]ach passenger screening system." 14 C.F.R. § 107.15(a)(1) and (2) (1991).

The airport security area at the Colorado Springs Municipal Airport was clearly posted with signs that all bags would either be screened by X-ray or searched. The security program required potential passengers presenting themselves at the checkpoint station for access to the sterile or boarding area of the airport to pass through a magnetometer, which is designed to detect metal objects. Because small metal objects can pass through a magnetometer without detection, as can dangerous nonmetal instruments or substances, the screening process also required a person to submit any hand-carried objects for X-ray screening or physical examination of the contents.

When the defendant arrived at the checkpoint station, he was wearing a small cloth-type bag fastened to his side. He first walked through the magnetometer without activating any signal. Because the bag he was wearing was considered a carry-on item, the security agent attempted to inspect the bag and its contents. The defendant refused permission to search the bag and stated that he would wait outside the security area. He then withdrew, without the consent of the security agent, to a waiting room located a short distance away. The security agent at this point notified Officer Bronson of the Colorado Springs Police Department, who was assigned to the airport security unit.

Officer Bronson arrived at the checkpoint station and interviewed the security agent, who pointed out the defendant to the officer. The officer noted that the defendant, who was standing directly in front of the checkpoint station, was walking "back and forth" and was acting nervously. When the officer asked the defendant what he was doing, the defendant replied, "I'm picking up a friend on this United flight ... I'm waiting for [a] judge." The defendant then began to slowly move the bag behind him.

Officer Bronson told the defendant that he had to check for a weapon and took the defendant to the police airport security office, which was a short distance from the checkpoint station. At the security office, the officer again told the defendant that he was checking for a weapon and did not intend to make an arrest. When the defendant refused permission for the search of the bag, the officer told him that he was going to search the bag. The defendant then told the officer that he would not like what he found and handed the bag over.

Upon opening the bag, Officer Bronson observed eight clear plastic bags of dried mushrooms.[5] The defendant, in response

---

**5.** After Officer Bronson opened the defendant's bag and observed the eight plastic bags of dried mushrooms, the defendant stated that this was "his first time" and that he was not selling drugs but rather used them himself because "they were natural" and were not "synthetic like co-

to the officer's request, emptied his pockets and removed another plastic bag containing mushrooms. After taking possession of the plastic bags, the officer permitted the defendant to leave the airport. A presumptive field test and subsequent laboratory analysis of the mushrooms proved positive for psilocybin. An arrest warrant was issued for the defendant on September 13, 1990, and he was taken into custody approximately one week later.

In granting the motion to suppress, the district court initially distinguished cases dealing with airport-security searches from the present case on the basis that the airport search cases involved individuals who were attempting to board an airplane, while in the present case the defendant had departed from the sterile area of the airport and was not in a position to introduce a weapon or a dangerous object into an aircraft. The court reasoned that Officer Bronson, although justified in inquiring of the defendant about the reason for his presence at the airport, was not entitled to make anything more than a nonintrusive frisk of the exterior of the bag for the officer's own safety during the temporary detention. Based on that reasoning, the court concluded that the officer's search of the bag was without probable cause and exceeded the legitimate scope of a limited frisk for a weapon.

In challenging the suppression ruling, the People claim that Officer Bronson's search of the bag was a constitutionally valid search based on probable cause. We conclude that the search was constitutionally valid, but do so on the basis that it was pursuant to a legitimate airport-security search to which the defendant consented by presenting himself at the checkpoint station for security screening.

## II.

 The Fourth Amendment to the United States Constitution and Article II, section 7 of the Colorado Constitution proscribe unreasonable searches and seizures. It is a fundamental principle of search and seizure jurisprudence that "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara v. Municipal Court*, 387 U.S. 523, 528–29, 87 S.Ct. 1727, 1730–31, 18 L.Ed.2d 930 (1967); *see Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978); *People v. Wright*, 804 P.2d 866, 869 (Colo.1991). There is no question that airport preboarding security screening constitutes a "search" in the constitutional sense of that term. *E.g.*, *United States v. Davis*, 482 F.2d 893, 904 (9th Cir.1973); *United States v. Epperson*, 454 F.2d 769, 770 (4th Cir.), *cert. denied*, 406 U.S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334 (1972).

 One of the recognized exceptions to the warrant requirement is the regulatory search pursuant to a statutory or administrative program. Nonconsensual warrantless searches without probable cause or individualized suspicion have been constitutionally upheld when conducted pursuant to a regulatory program calculated to further a manifestly important governmental interest under circumstances where the program is reasonably tailored to further the governmental interest and where the intrusion on personal privacy or security is relatively slight in comparison to the interest served by the program. *See e.g.*, *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (upholding warrantless and suspicionless drug testing of U.S. Customs Service employees seeking transfer or promotion to sensitive positions); *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (upholding Federal Railroad Admin-

---

caine." The officer then inquired of the defendant why he had the mushrooms divided into eight separate bags, to which the defendant replied, "Maybe I shouldn't answer that, I think I may need a lawyer." The district court limited its suppression ruling to the bags of mushrooms seized by the police officer and did not determine the constitutional admissibility of the defendant's statements to Officer Bronson in the police security office. We accordingly do not address the constitutional admissibility of those statements in this opinion.

istration safety regulations for alcohol and drug testing, without warrant or individualized suspicion, of any employee involved in train accident resulting in death, injury, or property damage); *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (upholding routine stopping of motorists at permanent border patrol checkpoints for brief questioning regarding residence status of occupants); *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (upholding warrantless and routine search of licensed firearm dealer's locked storeroom pursuant to inspection procedures authorized by Gun Control Act of 1968); *cf., Michigan Dept. of State Police v. Sitz*, —— U.S. ——, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (upholding warrantless and suspicionless stop and brief visual examination of driver pursuant to highway sobriety checkpoint program, even though cursory search is calculated to obtain evidence of crime of drunken driving); *People v. Rister*, 803 P.2d 483 (Colo. 1990) (upholding under Colorado Constitution warrantless and suspicionless stop and brief visual examination of driver pursuant to highway sobriety checkpoint program). Airport security screening procedures for potential passengers have consistently been upheld as a form of consensual regulatory search in furtherance of a systematic program directed at ensuring the safety of persons and property traveling in air commerce. *E.g., United States v. $124,570 U.S. Currency*, 873 F.2d 1240, 1242–43 (9th Cir.1989); *United States v. Lopez–Pages*, 767 F.2d 776, 778 (11th Cir.1985); *United States v. Gorman*, 637 F.2d 352, 353 (5th Cir.1981); *United States v. Cyzewski*, 484 F.2d 509, 513 (5th Cir.1973), *cert. denied*, 415 U.S. 902, 94 S.Ct. 936, 39 L.Ed.2d 459 (1974); *Davis*, 482 F.2d at 908–12. The rationale for this type of search was succinctly stated as follows:

> When the risk is the jeopardy to hundreds of human lives and millions of dollars of property inherent in the pirating or blowing up of a large airplane, the danger *alone* meets the test of reasonableness, so long as the search is conducted in good faith for the purpose of preventing hijacking or like damage and with reasonable scope and the passenger has been given advance notice of his liability to such a search so that he can avoid it by choosing not to travel by air.

*United States v. Bell*, 464 F.2d 667, 675 (2d Cir.), *cert. denied*, 409 U.S. 991, 93 S.Ct. 335, 34 L.Ed.2d 258 (1972) (Friendly, J., concurring) (footnote omitted and emphasis in original). An airport security search to which a potential passenger voluntarily consents by submitting himself to the screening process, therefore, need not be justified by any showing of probable cause or reasonable suspicion.

If air piracy and other acts of criminal violence in air travel are to be effectively eliminated, a reasonable measure of flexibility must be accorded to air security personnel in their effort to determine whether the person presenting himself at a checkpoint station is carrying a weapon, explosive, or other destructive substance that might pose a threat to persons traveling in air commerce. Hence, physical searches of carry-on items, even though conducted outside the perimeter of the sterile area, have been upheld when the purpose of the search is to allay any apprehension of a security risk occasioned by the inconclusive nature of other screening procedures. *Lopez–Pages*, 767 F.2d at 778–80; *United States v. Herzbrun*, 723 F.2d 773, 777–78 (11th Cir.1984).

■ There is no question that a potential passenger has the right to refuse an airport security search by leaving the checkpoint area at any time prior to the actual commencement of the screening process and that such refusal, without more, would not furnish any objective justification for any further detention or search. *See Florida v. Bostick*, —— U.S. ——, 111 S.Ct. 2382, ——, —— L.Ed.2d —— (1991). When, however, a potential passenger, with fair notice of the screening process, presents himself or his property at the checkpoint station for screening and the screening process actually commences, such person has consented to screening procedures directed to the discovery of a weapon, explosive, or other destructive substance. *E.g., United States v. Pulido–*

*Baquerizo,* 800 F.2d 899, 901–02 (9th Cir. 1986); *Herzbrun,* 723 F.2d at 776; *United States v. DeAngelo,* 584 F.2d 46, 47–48 (4th Cir.1978), *cert. denied,* 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 493 (1979). Once the screening process actually commences, it is only reasonable to allow the screening process to run its full course, including the physical search of any carry-on baggage or other items sought to be taken to the pre-boarding area. A rule allowing withdrawal of consent prior to completion of the screening process would "encourage airline terrorism by providing a secure exit where detection was threatened." *Pulido–Baquerizo,* 800 F.2d at 902; *see also DeAngelo,* 584 F.2d at 48; *McSweeney v. State,* 183 Ga.App. 1, 358 S.E.2d 465, 467 (1987). Moreover, the airport security personnel have a duty to discover firearms and explosive devices that pose a risk to air travelers, including airport occupants who have not yet entered the sterile area of the airport. This responsibility cannot be fulfilled if a potential passenger, after electing to undergo security screening and participating in the initial stage of the screening process, is permitted to prohibit a physical search of a carry-on item by removing himself from the checkpoint station and sterile area. *Pulido–Baquerizo,* 800 F.2d at 902. We conclude, therefore, that once consent has been manifested by a person's submission to the screening process, such consent cannot be withdrawn during screening procedures directed to the discovery of a weapon, explosive, or other destructive substance that could pose a serious threat to the safety of those traveling in air commerce.

██ We add here, by way of a caveat, that while security personnel must have a reasonable measure of flexibility in conducting an airport security search, the scope of any physical search of a carry-on item must be directed to determining whether the potential passenger is carrying an object that is potentially dangerous to air commerce. As long as the potential passenger has submitted to the airport security process and the security personnel conduct a physical search of a carry-on item that is no more intrusive than neces-

sary to achieve the objective of air safety, such search must be viewed as a reasonable part of airport security procedures, even if the search is conducted outside the perimeter of the sterile area. A physical search of a carry-on item, however, cannot be deemed a reasonable part of the airport security program if the search is beyond the purpose of the program. *See $124,570 U.S. Currency,* 873 F.2d at 1245–46.

### III.

██ In the instant case, the record clearly shows that the defendant was on notice as he approached the checkpoint station that all bags would be either subjected to X-ray screening or would be searched. The defendant also was aware that he could avoid the security encounter simply by foregoing any attempt to enter the sterile area of the airport before the screening process actually commenced. With this knowledge, the defendant presented himself for security screening by walking through the magnetometer. The airport security agent, however, had some safety concerns about the defendant's bag worn around his midsection and attempted, as his duty demanded, to inspect the contents of the bag. The defendant's refusal to permit the security agent to search the bag at this stage of the screening process was ineffective. Once the defendant consented to security screening by walking through the magnetometer, he had no right to withdraw that consent prior to completion of a reasonable search of his bag.

██ The record also demonstrates that Officer Bronson's search of the defendant's bag was for the purpose of determining whether the defendant had possession of a weapon or other dangerous instrument and was not undertaken as a pretext for discovering incriminating evidence or contraband unrelated to the objective of the airport security program. The search, in other words, was no more intrusive than necessary to satisfy the officer that the defendant was not carrying a weapon, an explosive device, or other destructive substance that could pose a threat to the safety of

persons and property traveling by means of air transportation, including potential passengers at the airport who had not yet entered the sterile area. Moreover, the search was conducted at the police security office, removed from public viewing, and to that extent was compatible with the privacy interest of the defendant. In short, the search was in all respects consistent with the airport security program to which the defendant consented by presenting himself at the checkpoint station for screening. In the course of executing the legitimate search of the defendant's bag, Officer Bronson discovered what appeared to be illegal drugs, which he properly seized.

We accordingly reverse the order of suppression and remand the case to the district court for further proceedings.